

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-12-1995

# IN RE: Penn Central Trans. Co.

Precedential or Non-Precedential:

Docket 94-2154

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation
"IN RE: Penn Central Trans. Co." (1995). *1995 Decisions.* Paper 305.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/305

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

IN THE MATTER OF:

PENN CENTRAL TRANSPORTATION COMPANY

USX Corporation and Bessemer and
Lake Erie Railroad Company,
                              Appellants


ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil Action No. 70-00347)


Argued July 24, 1995

Before:  BECKER, NYGAARD and ALITO, Circuit Judges

(Opinion Filed December 12, 1995)

TIMOTHY W. BERGIN, ESQUIRE
Squire, Sanders & Dempsey
1201 Pennsylvania Avenue, N.W.
P.O. Box 407
Washington, DC 20044
Attorney for Appellants

THOMAS S. KILBANE, ESQUIRE (Argued)
Squire, Sanders & Dempsey
127 Public Square
4900 Society Center
Cleveland, OH 44114-1304
Attorney for Appellants

WILLIAM J. TAYLOR, ESQUIRE
Taylor & Taylor
1801 Market Street
811 Ten Penn Center
Philadelphia, PA 19103
Attorney for Appellants

DAVID A. LYNCH, ESQUIRE
Senior General Attorney

USX Corporation
600 Grant Street
Pittsburgh, PA 15129-4776
Attorneys for Appellants

MATTHEW J. SIEMBIEDA, ESQUIRE (Argued)
CARL M. BUCHHOLZ, ESQUIRE
Blank, Rome, Comisky & McCauley
1200 Four Penn Center Plaza
Philadelphia, PA 19103
Attorneys for Appellee

KENNETH N. HART, ESQUIRE
JAMES J. CAPRA, ESQUIRE
Donovan, Leisure, Newton & Irvine
30 Rockefeller Plaza
New York, NY 10112
Attorneys for Appellee

ARLIN M. ADAMS, ESQUIRE
Schnader, Harrison, Segal & Lewis
1600 Market Street
Suite 3600
Philadelphia, PA 19103
Attorneys for Appellee

ROBERT W. OLSON, ESQUIRE
MICHAEL L. CIOFFI, ESQUIRE
American Premier Underwriters, Inc.
One East Fourth Street
Cincinnati, OH 45202
Attorneys for Appellee


OPINION OF THE COURT


NYGAARD, <u>Circuit Judge.</u>

Appellants, USX Corporation and the Bessemer and Lake Erie Railroad Company, sued the reorganized Penn Central Transportation Company (now known as American Premier Underwriters, Inc.) for contribution and indemnity based on Penn Central's participation with them in an antitrust conspiracy.

2

Although appellants were held liable for nearly $600 million in damages from that conspiracy, see In re Lower Lake Erie Iron Ore Antitrust Litig., 998 F.2d 1144 (3d Cir. 1993), the courts ruled that the direct claims against Penn Central were barred by its reorganization.

In response to the underlying lawsuit for contribution and indemnity, Penn Central filed a petition in its bankruptcy case to require the dismissal of the suit, alleging that the 1978 Consummation Order and Final Decree barred it. The district court granted the petition. In re Penn Central Transp. Co., No. 70-347 (E.D. Pa. Oct. 13, 1994). We will reverse.

## I.

The Penn Central bankruptcy proceeding is more than a quarter-century old; and the facts of the antitrust conspiracy are even older. Andrew Carnegie built the Bessemer to link his Pittsburgh-area steel mills to raw materials sources, specifically iron ore, received from ore ships at Lake Erie ports. The railroad was a wholly-owned subsidiary of United States Steel Corporation (now USX Corporation) until 1989, when it was spun off. USX, however, retained liability for the antitrust claims at issue under its indemnity agreement with the Bessemer.

Beginning in 1956, the Bessemer and several other railroads, including the Penn Central's predecessors, entered into a joint ratemaking agreement, which was given limited immunity from antitrust attack under § 5(a) of the Reed-Bulwinkle Act, ch. 491, 62 Stat. 472 (1948). In 1970, the Penn Central

3

filed a bankruptcy petition under § 77 of the Bankruptcy Act of 1898. This action, and the bankruptcies of several other regional railroads, motivated Congress to pass the Regional Rail Reorganization Act of 1973, under which the Penn Central conveyed its rail assets to Conrail in 1976. In 1978, the district court entered its Final Decree and Consummation Order, which included a limitation or bar date for all claims against the debtor. The Consummation Order transferred the reorganized Penn Central's railroad property and discharged it from any further claims predicated upon its pre-consummation acts or conduct. The district court retained jurisdiction over any claims that might later be asserted against Penn Central.

In 1980, Pinney Dock and Litton filed antitrust complaints against the Bessemer, Penn Central and other railroads. The claims against Penn Central were held barred by the discharge. In re Penn Central Transp. Co. ("Pinney Dock"), 42 B.R. 657, 676 (E.D. Pa. 1984), aff'd, 771 F.2d 762 (3d Cir.), cert. denied, 474 U.S. 1033, 106 S. Ct. 596 (1985). Between 1982 and 1984, several plaintiffs filed suits under federal and Ohio antitrust law against the signatories to the § 5(a) agreement, including Penn Central and the Bessemer. These claims were consolidated as the "MDL 587" litigation. The district court dismissed Penn Central as a defendant, concluding that because the claims arose pre-consummation they were discharged. All remaining defendants except the Bessemer settled with plaintiffs. The Bessemer went to trial and lost. Judgment was entered against it in excess of $592 million, and paid by USX. The

4

Bessemer and USX then filed complaints in federal and Ohio courts seeking indemnity and contribution from Penn Central, as the instigator, enforcer and primary beneficiary of the conspiracy.

## II.

The predicate conduct of appellants' antitrust liability began before Penn Central filed its bankruptcy petition.  Thus, Penn Central asserts that appellants' claims against it have been discharged by the Consummation Order and Final Decree.  Appellants argue, however, that their claims seeking contribution and indemnity could not possibly have been filed before the 1978 bar date, because they were not sued until later; and, hence should be treated as post-consummation claims, i.e., neither discharged nor barred.

## A.

We look to nonbankruptcy law to determine when these claims accrued.  See Schweitzer v. Consolidated Rail Corp., 758 F.2d 936, 941 (3d Cir.), cert. denied, 474 U.S. 864, 106 S. Ct. 183 (1985); In re M. Frenville Co., 744 F.2d 332, 335 (3d Cir. 1984), cert. denied, 469 U.S. 1160, 105 S. Ct. 911 (1985).  We agree with appellants that their claims for contribution and indemnity could not accrue until the MDL 587 complaints were filed against them between 1982 and 1984.  In Frenville, applying New York law, we opined that:

> For both separate actions and third-party complaints, a claim for contribution or indemnification does not accrue at the time of the commission of the underlying act, but rather at the time of the payment of the judgment flowing from the act.

5

744 F.2d at 337. The MDL 587 claims arose under federal and Ohio law. That law, for our purposes at least, is consistent with the law applied in Frenville. For example, the Ohio Supreme Court has stated that

> the right to contribution is inchoate from the time of the creation of the relationship giving rise to the common burden until the payment by a co-obligor of more than his proportional share, and . . . the right becomes complete and enforceable only upon a payment by the claimant extinguishing the whole of the common obligation.

National Mut. Ins. Co. v. Whitmer, 435 N.E.2d 1121, 1123 (Ohio 1982); see Ross v. Spiegel, Inc., 373 N.E.2d 1288, 1295 (Ohio App. 1977) (similar rule for indemnity). Applying federal admiralty law, we reached a similar conclusion. See Sea-Land Serv., Inc. v. United States, 874 F.2d 169, 171 (3d Cir. 1989).

## B.

That conclusion frames the issue that was before the district court and is now before us: whether a claim that arose after the 1978 Consummation Order was nevertheless discharged by that order. We have already answered that question in the negative, at least in the context of the § 77 reorganization presented by this case.[1]

---

[1] Indeed, our holding today was foreshadowed two decades ago in the § 77 case of In re Reading Co., 404 F. Supp. 1249 (E.D. Pa. 1975), which involved similar facts. There, the court held that claims for contribution and indemnity asserted against a bankrupt railroad were not prepetition in nature--even though the facts giving rise to primary liability occurred before the railroad declared bankruptcy--because the railroad settled with the plaintiff post-bankruptcy and only then did the cause of action for contribution and indemnity accrue. Id. at 1251.

In Schweitzer,[2] plaintiffs were exposed to asbestos during their employment with the Reading Railroad and the Central Railroad of New Jersey. Later, but before plaintiffs' injuries manifested themselves, these railroads consummated a reorganization under § 77. When plaintiffs discovered their injuries, they filed FELA actions against Conrail, which had succeeded to the former railroads' rail assets.

Conrail argued that the consummation order discharged any claims asserted by the injured workers, but we disagreed, noting first "that plaintiffs' rights only could have been affected by the discharge of all 'claims' against their employer if they had 'claims' within the meaning of section 77 prior to the consummation date of their employer's reorganization." Id. at 941. We concluded "that if plaintiffs had causes of action that existed under FELA prior to the relevant consummation dates they had 'claims.'"Id. We then analyzed plaintiffs' claims under FELA and concluded that no cause of action accrued until the manifestation of plaintiffs' injuries. Id. at 942.

This case is analogous to Schweitzer. Like the subclinical injuries there, appellants here had no cause of action against Penn Central pre-consummation. Because they could not have filed this action during the Penn Central bankruptcy,

---

[2]See also In re Central R.R. Co., 950 F.2d 887, 892 (3d Cir. 1991) (following Schweitzer), cert. denied, 503 U.S. 971, 112 S. Ct. 1586 (1992); Zulkowski v. Consolidated Rail Corp., 852 F.2d 73, 74 (3d Cir.) (same), cert. denied, 488 U.S. 994, 109 S. Ct. 559 (1988).

*Schweitzer*'s lesson is that their claims could not have been discharged.

Penn Central argues that appellants had pre-consummation, contingent, and dischargeable claims. It relies on our discussion in *Schweitzer* of the early § 77B case of *In re Radio-Keith-Orpheum Corp.* ("*RKO*"), 106 F.2d 22 (2d Cir.), *cert. denied*, 308 U.S. 622, 60 S. Ct. 377 (1939). We find that case to be inapposite.

In *RKO*, landlords leased property to a corporation's subsidiary, on condition that the parent corporation guarantee rent payments. When the parent went bankrupt, the subsidiary was still paying rent. The landlords did not file a claim against the bankrupt's estate. But after the debtor's reorganization when the subsidiary defaulted, they asserted that their claim on the guarantee was not discharged. The Court of Appeals disagreed:

> The appellants . . . were not as [a] matter of law entitled to stand aloof and obtain a continuance of the guaranties unaffected by reorganization, the equivalent of a preference for them over unsecured creditors with accrued or determinable claims. What they were entitled to was treatment as nearly like that accorded to ordinary unsecured creditors as the circumstances permitted[.]

*Id.* at 26-27.

Penn Central maintains that appellants here stand in the same position as the landlords in *RKO*. *Schweitzer*, however, counsels otherwise;

> The reasoning in *Radio-Keith-Orpheum* is not controlling here, however, because we do not believe plaintiffs had "interests" of any

8

character before injury manifested itself. In our view, before one can have an "interest" which is cognizable as a contingent claim under section 77, one must have a legal relationship relevant to the purported interest from which that interest may flow.

In Radio-Keith-Orpheum, although there had been no breach of the lease agreement and thus there was no present cause of action pursuant to the guaranties, there was a guarantor-guarantee legal relationship from which an interest in the guaranty could flow.[3]  There is no legal relationship, however, between a tortfeasor and a tort victim until a tort actually has occurred. . . .

758 F.2d at 943 (citation omitted).

Undaunted, Penn Central asserts that the § 5(a) agreement to which the Bessemer was a party takes this case out of the ambit of Schweitzer and places it squarely within the holding of RKO.  We cannot agree.  The key to Schweitzer's treatment of RKO was that the RKO landlords had explicitly bargained to look to the unreorganized debtor for their security. Here, however, the § 5(a) agreement confers no right of indemnification.  That agreement, although the source of appellants' primary liability to the MDL 587 plaintiffs, simply does not evidence an intent to look to the pre-reorganized Penn Central for contribution or indemnity claims.  Put simply,

[3] Accord Frenville, 744 F.2d at 336 ("The present case is different from one involving an indemnity or surety contract. When parties agree in advance that one party will indemnify the other party in the event of a certain occurrence, there exists a right to payment, albeit contingent, Such a surety relationship is the classic case of a contingent right to payment under the Code--the right to payment exists as of the signing of the agreement, but it is dependent on the occurrence of a future event." (Citations omitted.)).

9

although there was a legal relationship between the Bessemer and the Penn Central's predecessors, there was no legal relationship from which a prepetition interest in contribution or indemnity could flow. See id. at 943.

This conclusion is supported by the § 77 case of In re Penn Central Transp. Co. ("Paoli Yard"), 944 F.2d 164 (3d Cir. 1991). Penn Central and its predecessors operated a railroad yard on an electrified portion of its line. The land became contaminated from PCBs common in the electrical transformers of the period. As part of the Penn Central reorganization, the Paoli Yard was conveyed to Conrail, and later to SEPTA. Two years post-consummation, however, Congress imposed retroactive liability on former owners of toxic waste sites. The United States sued both SEPTA and Conrail, and Conrail sought contribution and indemnity from the reorganized Penn Central. Id. at 165-66.

The district court, construing Schweitzer narrowly, held that the Consummation Order barred the claims against the reorganized Penn Central. Id. at 166. We reversed, noting first that

> at the moment of the bankruptcy discharge and the inception of the injunction, CERCLA had not yet been passed by Congress. Indeed CERCLA was not enacted until 1980. Consequently, at the time of the Consummation Order, there was no statutory basis for liability to be asserted against [Penn Central] by the petitioners. Just as the employees in Schweitzer had no recognizable tort causes of action under the FELA prior to the employer railroad's relevant consummation dates, the petitioners here could not have

10

brought claims under CERCLA prior to the
Consummation Date.

Id. at 167. We then went on to reject the theory that a

contingent, dischargeable claim existed pre-consummation:

> Under the facts now before us in this appeal,
> it was not until the passage of CERCLA that a
> legal relationship was created between the
> petitioners and [Penn Central] relevant to
> the petitioners' potential causes of action
> such that an interest could flow. Because
> this legal relationship did not evolve until
> after the Consummation Date, the petitioners
> did not have contingent claims against [Penn
> Central]. Accordingly, our decision in
> Schweitzer leads us to the conclusion that
> the petitioners' asserted claims under CERCLA
> did not constitute dischargeable claims
> within the meaning of section 77 and thus
> survive the discharge of the debtor.

Id. at 167–68 (emphasis added).

In Paoli Yard, we made explicit what was implicit in

Schweitzer: it is not sufficient for dischargeability purposes

that there was some pre-consummation legal relationship between

the debtor and the party seeking now to assert a claim; rather,

that relationship must be relevant to the claimant's cause of

action. When CERCLA was enacted, two fundamental changes

occurred in that relationship: first, Conrail became primarily

liable for the toxic waste cleanup. Second, and more importantly

for our purposes, CERCLA made Penn Central potentially liable to

Conrail for contribution and indemnity. Only then did a legal

relationship relevant to the cause of action arise.[4]

---

[4]Likewise, in Schweitzer, there was undoubtedly an employer–
employee contractual relationship between the railroads and the
injured workers. That relationship, by itself, was not
sufficiently relevant to their tort claims that the workers

11

Although not necessary to our holding, Frenville also supports our conclusion that appellants' claims against the reorganized Penn Central were not discharged. In that case, banks sued an accounting firm for negligently preparing the debtor's financial statements. The firm sought relief from the automatic stay to claim contribution and indemnity from the debtor. 744 F.2d at 333-34. We held that, because the firm's claims for contribution and indemnity could not accrue until the banks sued the firm, the firm's claims arose post-petition and were nondischargeable; hence, the automatic stay was inapplicable. Id. at 337.

Frenville, of course, arose under the Bankruptcy Code, not § 77 of the 1898 Bankruptcy Act. Key to our analysis in Frenville was the definition of "claim" as a "right to payment" in 11 U.S.C. § 101(4), which we held was intended by Congress to be interpreted broadly. See id. at 336. Penn Central seizes on this distinction and urges us not to apply Frenville to this § 77 case. This, however, is a distinction without a difference. Section 77(b) of the 1898 Act defined "claims" as "debts" or "other interests of whatever character." In neither brief nor argument could counsel for Penn Central explain how these two definitions differ and why that difference should lead us to a different result here than in Frenville.[5]

_____

somehow agreed to look only to the debtors' estates for compensation.
[5] In response to Penn Central's argument that Frenville was wrongly decided and has not been well received by courts outside the Third Circuit, we direct its attention to Third Circuit Internal Operating Procedure 9.1.

12

Our holding makes for sound policy. Appellants could not have been expected to file a contingent claim pre-consummation based on the speculative possibility that their conduct, which began in the 1950s, might have extended beyond the bounds of its statutory antitrust immunity and that they might successfully be sued years later. If the Bessemer were required to act with such clairvoyance, then countless other entities that did business with the Penn Central and its predecessors, would also have been required to file contingent claims. Affixing value to these claims, both individually and in the aggregate, would be impossible, and the uncertainty thus created would render any reorganization plan unworkable. Indeed, we find the Schweitzer analysis of when asbestos-caused disease claims accrue both analogous and persuasive:

> If mere exposure to asbestos were sufficient to give rise to a F.E.L.A. cause of action, countless seemingly healthy railroad workers, workers who might never manifest injury, would have tort claims cognizable in federal court. It is obvious that proof of damages in such cases would be highly speculative, likely resulting in windfalls for those who never take ill and insufficient compensation for those who do.

758 F.2d at 942.

### C.

As a final ground for affirmance, Penn Central argues that, as a matter of law, appellants have no valid claims for indemnity or contribution. This argument, however, goes to the merits of appellants' indemnity and contribution claims currently

13

pending in other courts, which will proceed there once our mandate issues.  Hence, we do not reach the issue.

### III.

Because appellants' claims against Penn Central arose post-consummation and were not discharged, we will reverse and remand the cause for the district court to deny Penn Central's petition.