## In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.

## In re PETITION TO PURSUE ANTITRUST CLAIMS.

**In Proceedings for the Reorganization of a Railroad.**

**Bankruptcy No. 70–347.**

United States District Court, E.D. Pennsylvania.

May 22, 1984.

Kenneth N. Hart, Donovan, Leisure, Newton & Irvine, C. Evan Stewart, Curtis S. Gimson, New York City, for Penn Cent. Transp. Co.

Richard T. Colman, Howrey & Simon, Washington, D.C., Bruce W. Kauffman, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for Pinney Dock, Litton Industries, Inc., Litton Systems, Inc., Litton Great Lakes Corp., and Erie Marine, Inc.

MEMORANDUM AND ORDER
NO. 4243.

FULLAM, District Judge.

## I. INTRODUCTION

Pinney Dock & Transportation Company and Litton Industries (petitioners) have sought leave of this court to pursue antitrust actions against the Penn Central Corporation (PCC), the reorganized company which was formed as part of the Plan of Reorganization of the Penn Central Transportation Company (PCTC), the Debtor in these § 77 reorganization proceedings. Petitioners' requests for relief will be denied.

On August 17, 1978, this court entered Orders Nos. 3707 and 3708 which confirmed the Plan of Reorganization of the Penn Central Transportation Company (PCTC) and provided for the consummation of the Plan on October 24, 1978. These Orders will be referred to as the Confirmation and Consummation Orders. Section 77(f) of the Bankruptcy Act provides in part:

"On confirmation by the judge, the provisions of the plan and the order of confirmation shall ... be binding upon the debtor, all stockholders thereof, including those who have not, as well as those who have, accepted it, and all creditors secured or unsecured, whether or not adversely affected by the plan, and whether or not their claims shall have been filed, and if filed, whether or not approved, including creditors who have not, as well as those who have, accepted it.... The property dealth with by the plan, when transferred and conveyed to the [reorganized company] provided for by the plan ... shall be free and clear of all claims of the debtor, its stockholders and creditors, and the debtor shall be discharged from its debts and liabilities, except such as may consistently with the provisions of the plan be reserved in the order confirming the plan or directing such transfer and conveyance [of the

debtor's property to the reorganized company]."

A claim is described in § 77(b) as including "debts, whether liquidated or unliquidated, securities ..., liens, or other interests of whatever character."

On consummation of the Debtor's Plan of Reorganization on October 24, 1978, the Debtor's property was transferred to the reorganized company, PCC, free and clear of any claims against that property and the Debtor's liabilities, of whatever character, were discharged.

 Section 77(f) is an important aspect of the entire reorganization process. To be confirmed, a plan of reorganization must be feasible and also fair and equitable. A feasible plan is one that provides for the issuance of debt and equity securities of the reorganized company which are appropriate to the reorganized company's ability to generate revenue in excess of operating expenses. The fairness and equity standard requires that the reorganized company's securities be distributed under the plan in a way which properly reflects the priorities of the debtor's debt and equity holders. The discharge and free and clear transfer provisions of § 77(f) make it possible for the plan participants to exercise intelligently their right to vote for or against the Plan and for the court to apply properly the confirmation standards.

The Consummation Order complements § 77(f) by enjoining all actions against the reorganized company, PCC, based on claims against PCTC. Notwithstanding this injunction against suits against PCC, Pinney Dock and Litton filed complaints alleging antitrust actions against PCC and others on September 17, 1980 (Pinney Dock) and March 5, 1981 (Litton). These actions were based on conduct of PCTC or its corporate predecessors. For convenience, the two cases will be referred to as the Cleveland actions.

Apparently with PCC's acquiescence, limited discovery was taken in the Cleveland actions. Thereafter, PCC moved for and the district court granted a stay of the Cleveland actions against PCC. Pinney

Dock and Litton then filed their petition in this court for relief from the injunctive provisions of the Consummation Order. The matter was fully briefed and argued, and this court entered Memorandum and Order 4206 on September 20, 1983. At petitioners' request, they were accorded a second opportunity to introduce evidence and to conduct an evidentiary hearing. The petitioners then filed a large collection of documentary evidence and deposition excerpts and a second oral argument was held.

The gist of petitioners' antitrust claims is that PCTC and its corporate predecessors were members of an illegal conspiracy from 1958 through 1978, and that the members of the conspiracy, including PCTC and its corporate predecessors, engaged in actions in furtherance of the conspiracy which violated federal and state antitrust laws.

Petitioners' antitrust claims were not satisfied by distributions under the Plan as unsecured creditors because they did not file proofs of claim for these claims. Indeed, they have not as of this date sought leave to file a proof of claim late. By its terms, § 77(f) discharges claims whether or not a proof of claim is filed. Thus, the starting point is that the petitioners' claims are discharged, and PCC has no liability. It is agreed, however, that the petitioners did not have explicit evidence of the alleged conspiracy until 1979, and the petitioners argue that an unknown and undisclosed claim may not be subject to the discharge of § 77(f).

Rather than addressing their argument to the construction or application of § 77(f), petitioners have suggested a different approach. Their requested relief is for an exemption from the injunction provisions of the Consummation Order, and they couch the relevant legal question as one of judicial authority to amend that Order rather than a question of statutory construction or application. There is some appeal to this approach because, as petitioners point out, they may not succeed in the Cleveland actions, and even if they do succeed, the

other defendants may satisfy the entire judgment but not have any contribution rights against PCC. As I pointed out in my Memorandum accompanying Order No. 4206, the appeal of this argument is conservation of judicial resources and the avoidance of an unnecessary decision of a substantial legal issue. Avoiding that legal issue, however, would be accomplished at the price of substantially eroding § 77(f). If petitioners' claims are discharged, it is simply wrong to subject PCC to the cost and inconvenience of major antitrust litigation. This conclusion was stated in Memorandum 4206, and the parties were directed to brief the legal issues germane to § 77(f). The parties have fully briefed and argued those matters and they are now ripe for determination.

Petitioners now assert three general lines of argument.

1. Section 77(f) does not bar their claims because they did not receive notice of the proof of claims filing requirement which was adequate under § 77 or the Constitution.

2. If their claims were otherwise discharged under § 77(f), this court has the power to exempt their claims from the discharge and the petitioners have demonstrated equitable grounds warranting such relief.

3. If their claims are discharged and the court either lacks the power or refuses to exempt their claims from the discharge, the petitioners will be denied due process of law. These arguments will be considered separately.

## II. ADEQUACY OF NOTICE

### A. *Proof of Claim Program*

Section 77(c)(7) provides in pertinent part:

> The judge shall promptly determine and and fix a reasonable time in which the claims of creditors may be filed or evidenced and after which no claim not so filed or evidenced may participate except on order for cause shown [and] the manner in which such claims may be filed or evidence and allowed.

On December 17, 1970, this court directed the PCTC Trustees to make recommendations for the establishment of a proof of claims program. Participants in the case were also invited to make suggestions, and a hearing was held. The Trustees' estimated that there were approximately 100,000 potential claimants and recommended the use of a standardized proof of claim form and that certain classes of claims be exempted from the filing requirement. On February 18, 1971, Order No. 164 was entered. This Order fixed a filing date of June 1, 1971, for most claims, and required the use of a standard proof of claim form and schedules.

In conformity with § 77(c)(8), which requires that reasonable notice of the time to file claims be given to all creditors, Order No. 164 required the Trustees to mail the proof of claim form, schedules and filing instructions to all known creditors who had to file claims by June 1, 1971. Extensive public notice of the filing date and method for obtaining the necessary forms was also required and given.

Section 77(c)(4) contemplates that the reorganization court will direct the Trustees to file a list of creditors. Under that section, inclusion of a creditor on the list does not constitute the filing of a claim or the admission of liability for any purpose. In late 1970 and early 1971, when the proof of claim procedures were under consideration by this court, it was apparent that filing of creditors lists would be expensive, time-consuming, and of little utility. The main purpose of filing of lists is to ensure that proper notice is given. That goal was achieved by directing that the proof of claim forms be sent to any person who was shown on the Debtor's records as a creditor.

Later an acknowledgement procedure was implemented (Orders Nos. 914, 937), which required the Trustees to acknowledge claims which were consistent with the Debtor's records, and to specify reasons why other claims were not acknowledged.

Once claims were acknowledged, they were transferred to a claims docket which was available for inspection throughout the Debtor's service area. If no objections were filed after a claim was put on the claims docket, the claim was allowed.

Over 26,000 unsecured claims aggregating approximately $2.4 billion were timely filed. At the time the Plan was considered by the Court and voted on, approximately $475 million in unsecured claims had been acknowledged by the Trustees. Another $496 million in unsecured claims were in dispute. Of this amount, $358 million was attributable to a single antitrust claim which the Trustees opined was groundless. Of the remaining undisputed claims, the Trustees estimated that the Debtor's liabilities would be approximately $58.5 million.

About 3,000 proofs of claim were filed after the bar date. Again, standardized forms were utilized to simplify the task of claimants seeking to demonstrate good cause for the late filing of their claims (Order No. 914). About half of the late-filed claimants filed the appropriate petitions for relief from the bar order. After providing an opportunity for the claimants to file additional materials and to be heard with respect to their petitions, substantially all of the petitions for relief were granted, Memorandum and Order No. 4097, and approximately $100 million in late-filed claims were then put through the verification process (Doc. No. 17858).

Pinney Dock, Standard Slag Company (Pinney Dock's corporate parent) and Litton all received the proof of claim forms and information. Standard Slag and Litton filed claims, other than those raised in the Cleveland cases, received notice of the Plan proceedings, and voted in favor of the Plan.

Petitioners disparage the documents authorized by Order No. 164 on the ground that they were apt for commercial claims but not for their antitrust claims. No reason for this assertion is given. The proof of claim form required a general description of the claim, and for the most typical types of claims, the completion of a schedule designed to elicit information which would facilitate comparison with the Debtor's records. No "antitrust claim schedule" was included, but this is hardly a defect.

Petitioners' real contention is not a lack of notice of the need to file a claim or the date for filing a claim, but rather that they were entitled to notice of the existence and nature of their claims. No such requirement is contained in § 77, any other section of the Bankruptcy Act, or the Bankruptcy Code.

■ Well after this reorganization was filed and the proof of claims procedure was implemented, the Supreme Court promulgated rules applicable to Chapter X and § 77 cases (referred to in the Rules as Chapter VII cases), which did change the filing requirements. Section 196 of Chapter X and § 77 require creditors to file claims. Rule 10–401, effective August 1, 1975, and Rule 8–401, effective August 1, 1976, eliminated the need for the filing of claims by creditors whose claims are included on lists filed with the court; however, if the claim is designated as contingent, unliquidated or disputed, a claim must be filed. Under both rules, the court has the power to require all creditors to file claims. Neither rule requires notification to the claimant of whether or not the claimant's claim is listed, and if so, how. These innovative changes in bankruptcy administration were in marked contrast to the mandatory filing of proof of claims in ordinary bankruptcy cases, Bankruptcy Rules 301 and 302, effective August 1, 1973. Since the proof of claims program was largely complete when Rule 8–410 became effective, that rule was not applicable to this reorganization.

Section 1111(a) of the Bankruptcy Code, applicable to both corporate and railroad reorganizations, codifies the practice of Rules 8–401 and 10–401 by deeming a proof of claim filed for any claim which is listed and not designated as contingent, unliquidated or disputed. Bankruptcy Rule 3003, effective August 1, 1983, complements § 1111(a) of the Bankruptcy Code. Again, under neither the Code nor the Bankruptcy

Rule is it necessary for creditors to receive notice as to whether or how their claims are listed. Rather, creditors are free either to file a claim or to consult the schedule to determine the manner in which they are listed.

*New York v. New York, New Haven & Hartford R.R. Co.,* 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953), which is relied on by the petitioners, does not support the petitioners' contention. There, New York City and other known creditors were not advised by mail of the bar date for filing claims. New York City did not file certain real estate tax claims and the lower courts held New York City's real estate liens were void. Publication notice of the bar date was found adequate. The Supreme Court reversed, holding that § 77(c)(8) required reasonable notice and that notice by publication was not reasonable notice to creditors known to the trustee. Notice by mail was required. Nothing in this case suggests that New York City was entitled to anything other than mail notice of the bar date.

The *New Haven* holding was applied in this circuit in *In re Harbor Tank Storage,* 385 F.2d 111 (3d Cir.1967). A bulk oil storage concern filed a Chapter X reorganization proceeding. During the course of the proceeding, the debtor delivered about 75% of the tung oil owned by a claimant. The other 25% was missing. The claimant and the trustees cooperated in the claimant's effort to recover its loss from an insurance carrier. At no time was the claimant notified of the bar date or the plan proceedings and the trustee failed to respond to inquiries from the claimant about the reorganization. Almost immediately after the plan was confirmed, the claimant filed a petition for leave to file a proof of claim *nunc pro tunc.* The reorganization court denied the petition, but the court of appeals reversed, holding that under the *New Haven* case the claimant was entitled to mail notice of the bar date. The proce-

dural posture of the *Harbor Tank Storage* case was different from that in the *New Haven* case in that in *Harbor Tank Storage* a plan had been confirmed; however, the claimant sought relief before the plan was consummated. The Court of Appeals remanded the matter to the reorganization court for a determination of whether the claim belonged in class 4 or class 5. Class 4 claims, which totaled $73 million, were to receive securities of the reorganized company and certain litigation proceeds. Class 5 claims were to be paid in cash. There was no suggestion that recognition of the claimant's $22,000 claim would have any significance to the overall plan.

■ In sum, it is clear that in these proceedings the petitioners received notice of the bar date which satisfied both the statutory mandate of reasonable notice and the due process clause.

**B.** *Section 77(c)(4)*

■ Petitioners assert § 77(c)(4) imposes on the Trustees an independent obligation to disclose to the petitioners the possibility that they had antitrust claims against the Debtor.[1] Section 77(c)(4) provides, in pertinent part:

> The judge shall require the officers of the debtor or the trustee or trustees ... to ... submit such other information as may be necessary to disclose the conduct of the debtor's affairs and the fairness of any proposed plan.

Throughout the course of the reorganization the Trustees filed with the court frequent and extensive reports on operations and plan formulation. In connection with the plan, comprehensive financial information and other data relevant to the fairness of the plan was disclosed, extensively circulated, and exposed to intense adversary analysis. Included in the material provided was information about the proof of claim program and the liquidation of claims.

Although extensive discovery was taken, it is conceded that the Trustees and their

---

**1.** Petitioners also couch their § 77(c)(4) argument under the rubric "fraud on the court." The reasons for rejecting the defective notice argument apply equally to the fraud-on-the-court theory.

staff had no knowledge of any facts which suggested that the petitioners had antitrust claims against the Debtor. Petitioners contend that the Trustees' lack of knowledge is not determinative because the Debtor's files contained documentary evidence of the alleged conspiracy and officers of the Debtor acted in furtherance of this conspiracy during the reorganization. Petitioners reason that the availability of information concerning their antitrust claims demonstrates that the Trustees breached their duty to adequately report on the potential liabilities of the Debtor.[2] In essence, this line of reasoning is quite similar to the argument that the notice of the proof of claims procedure was defective.

Petitioners' theory is based on the accepted proposition that the trustees of a § 77 debtor have a fiduciary duty to the court and all those who have an interest in the estate. It is also permissible to assume for the purposes of discussion that a breach of this duty may create rights in those adversely affected by a breach of fiduciary duty. Indeed, *Harbor Tank Storage* may be viewed as an illustration of this assumption. But § 77(c)(4) must be read in conjunction with the obligation imposed by § 77(c)(7) on creditors to file proofs of claim. For example, if the claimant in *Harbor Tank Storage* had been given notice of the bar date but did not file a proof of claim, the trustee would have been obliged to object to the claimant's petition to file a late claim and the objection would have been sustained unless the claimant could demonstrate "cause" for late filing.[3] The basic point is that the bar order entered under § 77(c)(7) plays a central role in defining those entitled to participate under the plan. Acceptance of the petitioners' position that any and all claims which might be supported by information in the Debtor's files are exempt from the proof of

claim requirement would totally frustrate the entire reorganization process.[4]

■ Although petitioners' § 77(c)(4) argument is not persuasive, petitioners have combined that argument with a duty-to-investigate argument. Section 77(c)(9) contemplates that the court will direct the Trustees to investigate the management of the Debtor's affairs to determine whether the estate has any claims against third parties. Rule 8–208(3) includes in the list of the trustee's duties the duty to investigate liabilities of the debtor, and Rule 8–208(4) provides that the trustee shall "file a report with the Court concerning any facts ascertained by him pertaining to fraud, misconduct, mismanagement, and irregularities, and to any causes of action available to the estate."[5] Although the duties listed in Rule 8–208 became effective on August 1, 1976, and go beyond the literal meaning of § 77(c)(9), there is no question but that the Trustees had a duty to investigate the liabilities of the estate. It is the trustee of a § 77 debtor who has the primary burden to object to a proof of claim.

Petitioners take this duty to investigate to its logical extreme by asserting that it was incumbent on the Trustees to interrogate the officers and employees of the Debtor and to search all the files in the possession of the Debtor to determine whether there were any potential liabilities other than those asserted in the proof of claim program. There is no precedent which even intimates that a trustee in a reorganization has a burden approaching that suggested by petitioners.

The Penn Central reorganization was a very complex and often fast-paced proceeding involving important economic stakes for the economy of the Northeast. As a matter of law and fact, I am completely

---

**2.** Petitioners' distinction between the asserted duty of the Debtor and the Trustees to investigate is not pertinent.

**3.** See the discussion of *Meyer v. Fleming, infra.*

**4.** The Trustees completed an exhaustive search of their accounting records in an effort to send

notice of the proof of claim program to anyone who might have had a claim.

**5.** Section 1106(a)(3), (4) of the Bankruptcy Code imposes the same duties on trustees in reorganizations under the Code.

satisfied that the Trustees discharged their fiduciary duties fully.

Two other matters warrant mention. First, it is not clear that even if the Trustees had all the Debtor's files before them, the alleged illegality of the conduct would have been apparent or that the action of the Debtor's employees which are relied upon by the petitioners were related to the alleged conspiracy. These issues are at the heart of the Cleveland actions. Second, assuming a factual and legal basis for concluding that the Trustees failed to satisfy their duty under § 77, the nature of the remedy, if any, to be afforded is an open question. Petitioners' request for relief came well after the Plan was confirmed and the reorganization securities were widely dispersed in the public markets.

III. Exemption from the Discharge of § 77(f)

A. *Section 77(c)(7)*

█ Section 77(c)(7) authorizes the court to permit the late filing of claims on "cause shown". This standard is taken from the equity receivership practice, and has been summarized by the Supreme Court to permit late filing "provided the claim is equitable, the claimant is not chargeable with *laches*, and the assets have not been distributed; and provided further that the late filing does not unduly delay proceedings." *Meyer v. Fleming*, 327 U.S. 161, 169 n. 18, 66 S.Ct. 382, 387 n. 18, 90 L.Ed. 595 (1946) (citations omitted). Few cases of recent vintage have discussed this rule in detail.[6] Presumably, petitioner's awareness of this long-established interpretation of § 77 explains why the petitioners have never invoked § 77(c)(7). Even if the petitioners' filing of their Cleveland actions in 1980 and 1981 were treated as requests to file a late claim, no relief would be appropriate because the Plan of Reorganization had been confirmed and billions of dollars in reorganization securities and cash had been dis-tributed pursuant to the Plan well before the filing of the Cleveland actions.

Petitioners seek to avoid the impact of § 77(c)(7) by focusing their request for relief on the Consummation Order. As already pointed out,[7] Petitioners' approach actually raises the issue of the finality of the Confirmation Order: Does this court have authority to exempt petitioners' anti-trust actions or claims from the discharge of § 77(f)? Of course, if the "for cause shown" proviso of § 77 is the exclusive method available the petitioners to achieve participation under the Plan, relief from the Confirmation Order is not appropriate.

Section 77 does not contain any explicit authority for modification of a confirmed plan of reorganization. In 1947, the Supreme Court rejected a railroad debtor's efforts to reopen a confirmed plan of reorganization and to modify that plan. *Insurance Group Committee v. Denver & R.G. W.R. Co.*, 329 U.S. 607, 67 S.Ct. 583, 91 L.Ed. 547 (1947). The debtor railroad attacked the plan on the ground that improvements in the economy since the original hearings on approval and confirmation of the plan were such that the plan was no longer fair and equitable to junior creditors and stockholders. Congress responded to the Supreme Court's ruling in 1948 by enacting P.L. 478.[8] This legislation was applicable to § 77 reorganizations and authorized the Interstate Commerce Commission or the reorganization court to reconsider confirmed plans which had not yet become final. The thrust of the legislation was to create an opportunity for junior creditors and stockholders to bring to the court's attention "changes, facts, or developments ... since approval of [the] plan" which might demonstrate that the plan was no longer fair and equitable. Under P.L. 478, once an order of confirmation became final, the court could not reconsider or modify

---

**6.** See *In re United Cigar Stores,* 82 F.2d 744 (2d Cir.1936). In this reorganization the rule of *Meyer v. Fleming* was applied in deciding whether claims filed after the bar date but before confirmation of the plan would be permitted to participants under the plan. See p. 665, *supra.*

**7.** See p. 661, *supra.*

**8.** Reprinted in 10 *Collier* 1861 (14th ed.).

the plan. Finality of a confirmation order was defined to be the expiration of the time within which to take an appeal or the exhaustion of appeals which were taken.

The scheme of § 77 is generally consistent with the other chapters of the Act and the Bankruptcy Code. Chapters X and XI of the Act, which were enacted after § 77, do deal with modification to a confirmed plan. Section 222 of Chapter X authorizes the court to modify a confirmed plan of reorganization if the plan participants accept the modification; however, under § 229, once a plan is consummated by transfer of the debtor's property, assumption of the business operations by the reorganized company, or distribution of the plan securities, the plan may not be modified. A Chapter XI plan of arrangement providing for the extension of the time for the payment of creditors may be modified even after confirmation provided the debtor has not yet distributed negotiable paper to the creditors participating under the plan. On the other hand, § 386 permits revocation of an order confirming a Chapter XI plan on the ground that confirmation was procured by fraud if a motion for such relief is made within six months of confirmation of the plan.

These provisions of the Act have been assimilated into the Bankruptcy Code. Section 1127(b) of the Bankruptcy Code authorizes modification of the confirmed plan "before substantial consummation of such plan," and § 1144 authorizes revocation of a confirmed plan because of fraud in its procurement if a motion for such relief is made within 180 days of confirmation of the plan. An order entered under § 1144 must "contain such provisions as are necessary to protect any entity acquiring rights in good-faith reliance on the order of confirmation."

 When § 77 and P.L. 478 are considered together in the context of the finality accorded plans of reorganization and arrangement under Chapters X and XI of the Act, the conclusion which must be drawn is that a § 77 plan of reorganization may not be altered once the order confirming the plan becomes final. Even if it is assumed that this court has residual equitable power to permit petitioners to participate under the PCTC's Plan of Reorganization, any potential exercise of that authority at this late date must be considered in the context of the long-standing bankruptcy policy that confirmation orders are final and that the rights of the original participants under the Plan and third parties dealing in reorganization securities must be adequately protected.

### B. *Equitable Grounds for Relief*

Petitioners have introduced a large collection of documents and deposition excerpts in support of their contention that there are equitable grounds for exempting them from the effect of the Confirmation Order. Since this theory is novel to bankruptcy law, it is not surprising that petitioners have framed their arguments in terms of opening the Consummation Order pursuant to Rules 60(b)(3) and (6). These provisions of the Civil Rules permit the opening of a judgment when fraud or any other reason justifying relief is found.

 In addition to reliance on Rule 60(b), petitioners have implicitly relied on the tolling principles applicable to the antitrust statute of limitations. In general, an antitrust claim arises when an overt act in furtherance of an illegal conspiracy harms the putative plaintiff; however, if the conspiracy is concealed from the plaintiff, the statute of limitations is deemed tolled. In the Cleveland actions, Judge Thomas was apparently presented with an evidentiary submission by petitioners similar to that presented to this court. In ruling on summary judgment motions by PCC's co-defendants, Judge Thomas held that there was a genuine issue of fact for the jury on the concealment issue. In addition to relying on Judge Thomas' holding, the petitioners have presented their factual evidence to this court on the theory that PCTC and its predecessors concealed the conspiracy from the petitioners, and that this concealment is a proper basis for granting equitable relief from the discharge provisions of § 77(f).

■ In the Memorandum accompanying Order No. 4206, I pointed out that "facts which might justify a finding that the statute of limitations is tolled may not constitute an appropriate basis for an exemption from § 77(f)." After having the benefit of additional briefs, I am satisfied this conclusion is correct.

■ Tolling of the antitrust statute of limitations because of concealment of an illegal conspiracy is not part of the antitrust legislation, but rather is a doctrine of federal common law having its origin in *Bailey v. Glover*, 88 U.S. 342, 21 Wall. 342, 22 L.Ed. 636 (1874). Application of the tolling doctrine in antitrust cases is fully consistent with the deterrent purpose of the treble damage provisions of the antitrust laws and the importance of private enforcement of the antitrust laws.

■ Bankruptcy proceedings introduce a far different situation. Section 77(b) provides that "all statutes of limitations shall be suspended during the pendency of a proceeding under this section." In lieu of the applicable statute of limitations, the bankruptcy law and § 77 in particular substitute the proof of claims procedure. Although the time for filing claims in straight bankruptcies is absolute,[9] the "for cause shown" proviso of § 77(c)(7), is more liberal. Claims not asserted in a timely manner or exempted from the filing date are barred by the discharge.

The concealment standard for tolling of the antitrust statute of limitations is designed to ensure achievement of the substantive policies of the antitrust laws. On the other hand, any modification of a confirmation order is antithetical to the objectives of the bankruptcy laws. Therefore, petitioners' evidentiary materials must be evaluated without any preconceived relationship between the concealment standard and what might constitute appropriate grounds for relief from a confirmation order.

### 1. *Common Factual Background*

Petitioner's evidentiary submissions have a common factual background. Much of the iron ore used by steel plants in Northern Ohio and Pennsylvania was transported over the Great Lakes to docks on Lake Erie and then moved by rail to the steel plants. Until the 1950s, the iron ore was shipped by vessel in raw or bulk form. At the Lake Erie docks the ore was removed from the ships by dockside equipment known as huletts and placed directly in rail cars or stored on the dock for later rail shipment. In the late 1950s, the iron ore suppliers developed the capability to produce iron ore pellets. Pellets could be unloaded from vessels by use of conveyor systems built into the vessels. A number of the vessels on Lake Erie, known as self-unloaders, had conveyor systems which had been developed for use with other cargoes.

The combination of the availability of pellets and self-unloader vessels to carry the pellets altered the situation on Lake Erie in two ways. First, docks without huletts could now receive iron ore cargoes. Second, the docks with huletts were confronted with the possibility of losing cargoes to docks without huletts and the docks with huletts had to decide how to structure the handling charges for cargoes which did not require use of huletts.

Most of the docks on Lake Erie were owned by railroads and those dock facilities were designed and equipped for the traditional hulett offloading of raw iron ore. Pinney Dock was one of the few private docks on Lake Erie. Pinney's facility is located next to what was originally the New York Central's dock in Ashtabula, Ohio.

The primary impediment to Pinney Dock's handling of ore pellets was the rates charged for moving ore from the Lake Erie docks to the steel mills. Cargoes unloaded at railroad docks cost less to move by rail than cargoes unloaded at Pinney Dock. In general, the higher rail cost offset the benefit a steel company might

---

9. *In re James Pigott*, 684 F.2d 239 (3d Cir.1982).

obtain by bringing self-unloaders to Pinney Dock. Pinney Dock's claim in its Cleveland action is that this cost differential was the product of an illegal conspiracy among the Lake Erie rail carriers.

Litton's involvement in Lake Erie started in the mid-1960s. At that time the Lake Erie fleet had very few self-unloaders, and the available self-unloaders were relatively small, labor-intense to operate, and not capable of unloading cargoes any significant distance from where the vessel was berthed. Litton's business objective was to design, build and sell a new and larger self-unloader which could be operated with a small crew and have the capacity to off-load the cargo a greater distance from the vessel.

Litton acquired and developed a shipyard in Erie, Pennsylvania. One Litton super self-unloader was sold to Bethlehem Steel. The second vessel built by Litton was eventually sold to a Litton subsidiary, Wilson Marine. Litton's efforts were not limited to the marketing of self-unloaders. It also sought to present itself as the firm capable of designing and building more advanced handling equipment and systems which would be integrated with their self-unloaders to produce more cost-efficient handling of iron pellets.

Generally speaking, self-unloaders would only be attractive acquisitions for shipping companies if the steel mills had an incentive to use those vessels because of lower aggregate shipping costs. The railroad owned docks, with but minor exceptions, imposed the same handling charges for self-unloaders as they did for vessels which were unloaded by railroad huletts. During the time Litton sought to market its self-unloader, the railroads on Lake Erie refused Litton's request to establish formally a lower handling charge for self-unloaders. In this situation, the only economy the new self-unloaders offered was in the vessel portion of the shipment. Apparently, that saving was not sufficiently attractive to

potential purchasers of the vessel to justify the capital expense of acquiring Litton's self-unloader. Litton produced only two vessels and closed down its Erie shipworks after the second vessel was completed in 1973. Litton's antitrust claim is that its failure in the self-unloader business was attributable to an illegal conspiracy among the Lake Erie carriers.

■ Railroad rates and dock charges were subject to regulation by the Interstate Commerce Commission (ICC). A unique aspect of the ICC regulatory scheme was § 5a of the Interstate Commerce Act. Section 5, which was originally in Reed-Bulwinkle Act, authorized railroads to participate in joint rate-setting arrangements when approved by the ICC. The Lake Erie carriers set rates pursuant to an ICC-approved agreement. 277 I.C.C. 279 (1950). Actions taken pursuant to an approved rate-setting agreement are not subject to the antitrust laws. In the Cleveland actions, the court has denied a summary judgment motion by PCC's co-defendants based on the § 5a immunity. The issues before that court involve the substantive scope of the immunity and whether actions of the railroads alleged by Pinney and Litton as violating the antitrust laws are protected by the immunity.

Railroads participating in rate-setting arrangements were authorized by statute to depart from the rates set under the agreement. This right of independent action, which is specifically recognized in the § 5a agreement, and the general existence and functioning of the § 5a agreement form the legal context in which the railroads operated. Many of the events which are the subject of the petitioners' evidentiary submission involve the "Rate Committee" [10] which administered the § 5a agreement and efforts by Pinney and Litton to have PCTC, or its predecessor, New York Central, exercise its right of independent action. Nothing contained in the discussion of the petitioners' evidentiary submis-

---

**10.** The formal name is the Coal & Coke & Iron Ore Committee. The Railroad Revitalization & Regulatory Reform Act of 1976, amended § 5, and the current version is codified at 49 U.S.C. § 10706.

sion is to be taken as expressing a view concerning the scope of the antitrust immunity or whether the conduct in question is protected by § 5a.

### 2. Pinney Dock

Prior to the filing of PCTC's reorganization petition in June of 1970, Pinney Dock sought to handle iron ore cargoes on two occasions. In 1957, a steel mill expressed interest in using Pinney Dock to handle a self-unloader cargo. Although the New York Central proposed to the Rate Committee that a favorable rate be published, none was ever published, and Pinney did not handle the offered cargo. A similar situation developed in 1968. A steel mill was interested in using Pinney Dock to receive a self-unloader cargo. The mill inquired of PCTC concerning the availability of a favorable rail rate from Pinney Dock to the mill. PCTC did not quote the line haul rate from its dock, but rather the higher rate generally applicable from Pinney's dock. The mill did not utilize Pinney Dock, and Pinney pressed PCTC for an explanation of its refusal to quote a lower rate. It was informed that PCTC's action was due to a recommendation of the Rate Committee. Pinney was not satisfied, and in the fall of 1968 PCTC reiterated the point that it was "bound by [the Rate Committee's] recommendation," but the PCTC official also offered the reason that the lower rate was designed for high-volume shipments on a regular basis, and that giving Pinney the lower rate would be "damaging to the railroads and to the iron ore shippers." This latter point had been communicated to Pinney indirectly by the steel mill involved, which had informed Pinney that PCTC regarded Pinney as a direct competitor with PCTC's Ashtabula dock operation.

In January of 1969, Pinney invoked the ICC's informal procedures to challenge PCTC's rate structure for iron ore shipped from its dock. An ICC informal proceeding basically involves an effort by the ICC staff to mediate the shipper-railroad dispute. The ICC's remedial authority may not be exercised as part of an informal proceeding. PCTC refused to make any concessions and defended its higher rates from Pinney's dock. After the informal complaint procedure proved fruitless, Pinney engaged counsel to evaluate the possibility of filing a formal complaint.

Pinney's analysis of the 1968–69 events is that the reasons offered by PCTC for not awarding Pinney favorable rates was false: the real reason was that PCTC was acting in furtherance of the alleged conspiracy. PCC argues a much different inference: the clear reference to a recommendation of the Rate Committee put Pinney on notice that PCTC was acting with the other railroads to protect the existing business arrangements of PCTC and the other railroads. Resolution of this dispute is not necessary to decide the issues before this court. Suffice to say, there is evidence supporting Pinney's contention. What is clear is that Pinney aggressively sought a favorable rail rate from its facility and was unsuccessful.

Beginning in the fall of 1970, Pinney Dock and PCTC explored the possibility of some form of joint arrangement in Ashtabula. An implicit assumption of these discussions was that if an arrangement was worked out, PCTC would move cargoes from Pinney Dock at the same rate cargoes were moved from PCTC's dock. In the summer of 1971, PCTC objected to Pinney Dock's effort to obtain the requisite regulatory approvals to improve its harbor facilities. PCTC contended that Pinney Dock's proposed dredging and other harbor improvements would adversely affect PCTC's Ashtabula dock. This opposition by PCTC was perceived by Pinney as inconsistent with any joint effort and apparently the discussions were terminated.

During the spring of 1971, PCTC and other railroads made known their opposition to any regularized departure from the industry practice of imposing the same per-ton charge for self-unloaded and hulett-unloaded cargoes. Pinney argues that PCTC's action on the self-unloader charge issue and PCTC's opposition to Pinney's harbor expansion demonstrate that PCTC's

exploration of a joint arrangement between Pinney and PCTC was merely a ruse. There is no direct evidence to support the ruse theory and, if anything, the record suggests that PCTC was actually pursuing the simpler strategy of treating Pinney as a competitor until they became partners. In any event, by the summer of 1971, Pinney concluded that PCTC was not really interested in going forward with a joint arrangement.

The record does not focus on what went on between PCTC and Pinney between the summer of 1971 and 1974. In mid-1974, the possibility of a joint arrangement between Pinney and PCTC was actively discussed again. Apparently, this was part of PCTC's continuing analysis of the Great Lakes iron ore traffic and PCTC's capability to obtain a substantial share of the rail traffic generated on the Great Lakes. Exactly how these discussions progressed is not fully developed in the record, but apparently the April 1, 1976 takeover of PCTC's rail property by ConRail precluded any joint arrangement. In the late summer of 1975, Pinney officials were hopeful that it would obtain favorable rates without having consummated a joint arrangement with PCTC.

In the fall of 1975, Pinney took another tack. The ConRail takeover had created the possibility of another railroad getting trackage rights to serve Pinney's facility and Pinney pursued that possibility. Pinney did not obtain the rate immediately and shifted its focus to the use of trucks, and by mid-1976 Pinney was moving substantial quantities of iron ore by truck.

On April 1, 1976, PCTC conveyed its rail properties to ConRail. Petitioner's evidentiary submission does not contain any evidence that PCTC was in any way involved in subsequent events affecting Pinney.

This summary of the evidence submitted by Pinney is consistent with findings proposed by Pinney. PCC has developed its own factual case designed to demonstrate that Pinney had enough information to conclude that it had an antitrust conspiracy claim against PCTC. Essentially, this same argument was the basis of a summary judgment motion by PCC's co-defendants in the Cleveland action. The Cleveland court denied summary judgment on the ground there was a genuine issue of fact. For the purpose of this proceeding, it will be assumed that Pinney did not have reason to know of the evidence supporting the alleged conspiracy claim.

Once one eliminates the adjectives used by Pinney to characterize PCTC's conduct, the factual evidence boils down to a single point. PCTC never refused absolutely to grant Pinney a favorable rate, but rather entertained Pinney's requests to work something out. In 1971, Pinney concluded PCTC would not cooperate. In 1974, new discussions were held, but they were not successful. Pinney initiated these discussions. These events must, of course, be examined in the context of how PCTC's conduct relates to Pinney's failure to file a claim in the reorganization proceeding.

### 3. *Litton*

Litton's primary dealings with PCTC involved the potential development of Whiskey Island, which is located in the Cleveland harbor. Litton's Wilson Marine was in the process of proposing a long-term shipping contract to Republic Steel. Litton needed a suitable unloading facility to accommodate its self-unloaders and to store ore for shipment up river to Republic. A large portion of Whiskey Island was vacant and suitable for Litton's purposes.

From April of 1968 through the summer of 1969, PCTC and Litton discussed the possibility of developing the vacant land on Whiskey Island as a dock and storage area for self-unloader vessels. From the outset, PCTC and Litton recognized that each firm had different objectives and considerations. Nonetheless, they embarked upon a joint feasibility study. PCTC was concerned that a PCTC-Litton joint venture which excluded other users from any new facility, as Litton had proposed, would not sit well with many of PCTC's other steel customers and that the reduced cost of delivering of ore to the Lake Erie ports might reduce the

competitiveness of imported ore which PCTC moved from the East Coast inland.

PCTC's first suggestion was that Litton would lease a large portion of the Whiskey Island property from PCTC on a fixed rental plus royalty basis. As part of the lease arrangement, PCTC wanted Litton to charge a price for moving the ore from Whiskey Island up river that was in excess of Litton's actual costs. PCTC's motivation apparently was to keep the relative competitive positions of the various steel mills stable. Acceptance of this stipulation by Litton would have reduced the overall benefit to any steel company of using a Litton facility on Whiskey Island. In April of 1969, PCTC made a new proposal. PCTC would construct the necessary facility to service Litton's vessels and charge Litton a fixed per-ton charge. A condition precedent to undertaking the capital improvements necessary was that Litton obtain a long-term shipping contract with the steel mill. Although Litton did not object to the rate of return on investment that PCTC used in calculating its per-ton charges, Litton was of the view that the per-ton charges would yield a return in excess of PCTC's required return on investment. Litton made a counter proposal that it would build and have sole control over the Whiskey Island facility.

At this time, Litton was under substantial time pressure to make a final proposal to Republic and, because there was no firm agreement with PCTC, Litton explored a new plan for unloading ore in the Cleveland harbor. When PCTC found out Litton was pursuing this alternative approach, PCTC informed Litton that it considered itself free of its earlier promise not to pursue independently or with others the development of Whiskey Island. PCTC and Litton did agree that they would continue to evaluate the proposed joint venture.

The PCTC vigorously opposed Litton's alternative approach for unloading ore in the Cleveland harbor. This was apparently motivated by concerns as to the adverse impact of vessel traffic in the harbor and also for competitive reasons. By the sum-

mer of 1969, the Whiskey Island discussions were for practical purposes at an end.

At the time of the negotiations, Litton's executives believed PCTC did not comprehend the potential significance and value of Litton's approach to both Litton and PCTC. Litton now labels the Whiskey Island negotiations as a sham. There is no direct evidence PCTC bargained in bad faith. What is clear is that PCTC was not willing to make the concessions which Litton felt were necessary to make the Whiskey Island proposal satisfactory to Litton.

Litton had direct contact with PCTC in two other situations. In January of 1971, Litton knew that PCTC had formally proposed to the Rate Committee that a tariff imposing a $1.41 per-ton charge be imposed on self-unloaders using railroad docks. This charge equaled the total charges applicable to bulk cargoes. Litton protested to PCTC. Prior to the protest, PCTC had already determined that the other Lake Erie carriers would not publish this rate, and PCTC decided to drop its proposal. Litton makes much of the correspondence between Litton and PCTC concerning the proposed charge, and contends that PCTC falsely represented to Litton that the proposed charge was not intended to apply to self-unloaders. Litton's contention is not supported by the record. PCTC responded to Litton's draft protest letter by asserting that Litton was incorrect in its view that ordinarily the only fee charge self-unloaders was the 43¢ per-ton charge for moving ore from dock storage to rail cars. PCTC asserted that the published charges, including the 43¢ per-ton charge, were only applicable to bulk cargoes where railroad equipment was utilized for unloading. Nothing in PCTC's response suggested that the proposed $1.41 per-ton charge was intended to apply to anything but self-unloaders.

In May of 1971, Litton began discussions with Pinney Dock. Although Litton found Pinney Dock's facilities quite adequate and attractive, Litton was unable to work out an arrangement with Pinney Dock because PCTC's rail rates applicable from Pinney

Dock's facilities were higher than the rail rates available from railroad docks.

The last two aspects of the evidentiary submission relate to PCTC's approach to the sale of its real estate in Erie, Pennsylvania, and Litton's negotiations with the C&O Railroad.

Erie, Pennsylvania, is located on Lake Erie, and for many years was an active port. Apparently by the mid-1960s, the Erie docks were not actively involved in the ore trade. In 1967, the City of Erie, which already owned substantial lakefront property, contracted with the Pennsylvania Railroad to purchase 45 acres of lakefront property for the development of a park and recreational facility. Before closing the sale transaction, PCTC sought to add to the deed a restrictive covenant against commercial use and reverter clause. PCTC's objective was to prevent the parcel from later being developed by the City of Erie for commercial dock purposes or sold by the City of Erie for use as a self-unloader facility. The dispute between Erie and PCTC dragged on for a number of years. The property was eventually conveyed to Erie with a 10-year restrictive covenant.

Early in 1970 another company approached PCTC with a lease proposal. This was rejected because PCTC felt that if the proposed lease was consummated, the lessee would be able to cancel its existing lease with the Erie Port Authority, and the Erie Port Authority could then utilize the ground which was previously leased for a self-unloader facility.

PCTC was also concerned that Litton might obtain waterfront land in Erie by acquiring an outstanding option on 68 acres of PCTC land which at one time had been an ore dock. PCTC had leased the parcel with an option to purchase to a large industrial firm which already owned 250 acres in Erie. Litton did obtain an option to buy both PCTC's land and the other 250-acre parcel. Litton never exercised its option and the original PCTC option lapsed.

After the option lapsed, the City of Erie initiated discussions with the PCTC Trustees to purchase the ore dock property.

PCTC executives opposed this sale on the ground that it might result in the development of a self-unloader facility. Another firm made a competitive offer for the ground which included a restrictive covenant that it would not be used for ore unloading. PCTC found this proposal acceptable because it protected their competitive position. Although the record is not clear, it appears that some years later, after the transfer of PCTC's rail properties to ConRail, the property was eventually sold to the Erie Port Authority.

Litton acknowledges that it had no knowledge of PCTC's position concerning the development of PCTC's Erie property. Thus, the Erie real estate transactions do not constitute any evidence that PCTC's conduct had any effect on Litton's failure to file a claim in these proceedings.

As early as 1968, Litton explored with the C&O Railroad the possibility of using either its Fairport or Lorraine docks to handle self-unloaders. Litton's interest in these facilities became more intensive in mid-1970, and from that time until mid-1971, Litton actively pursued an arrangement with the C&O to use the Lorraine docks. The Lorraine docks were losing money at that time because of low volume, and the C&O staff evaluated the Litton proposal on the basis of having a combined operation which retained the C&O's bulk traffic and also accommodated Litton's self-unloader traffic. Internal C&O studies indicated that on a purely incremental cost basis, Litton's proposed 25¢ rate would be compensatory.

In early 1971, Litton pressed the C&O for a rate quote and was given the C&O's established rate of 65¢ per ton. This rate was offered for the 1971 season. C&O then convened a meeting in April of 1971 of the Lake Erie ore carriers to discuss 1972 handling charges. C&O suggested a possible handling rate of less than the 46¢ per-ton storage-to-car charge then applicable to bulk cargoes. All the other railroads objected. PCTC viewed the rate as a decided preference for the steel mills which had arrangements with Litton and predicted

that if the handling rate was lowered below the ordinary cost charged bulk vessels for direct loading to cars, 65¢, PCTC would be forced to reduce its bulk vessel charges to equalize the steel companies' costs. The C & O was also advised that some of its steel company customers would be quite unhappy if the C & O-Litton deal disadvantaged them because they only had access to bulk vessels.

The C & O eventually quoted the 65¢ per-ton charge to Litton for the 1972 season, and Litton rejected the offer. From May through July 1971, Litton pursued the idea of leasing a portion of the Lorraine docks to unload and store ore pellets. This was ultimately rejected by the C & O for a number of reasons. Leasing the property to Litton would, in effect, have given Litton's shippers a lower unloading cost and thereby triggered the possibility of reduced bulk vessel charges on Lake Erie. This possibility was made known to the chief executive officer of the C & O by a letter from the then-chief executive officer of PCTC. At some time in the summer of 1971, the C & O-Litton discussions terminated.

Litton knew of the April 1971 meeting of railroads to discuss the C & O's plans for handling Litton cargoes and prior to the meeting conveyed to officials of the C & O Litton's view that it objected to the idea of the railroads colluding to determine strategy on lake transfer terminals.

### 4. *Appropriateness of Relief*

■ The evidentiary submissions must be considered in the relevant legal context. Petitioners' approach of seeking relief from the Consummation Order rather than the statutory discharge of § 77(f) permits them to cast the issue as an application of Rules 60(b)(3) and (6) of the Federal Rules. These rules are ordinarily relevant after litigation has been concluded and a party to the litigation seeks to vitiate the finality of the judgment because of the opposing party's conduct in the course of the litigation. No traditional litigation between petitioners and PCTC preceded entry of the Con-

summation and Confirmation Orders; however, the proof of claims program and the plan and confirmation proceedings may be viewed as analogous to traditional litigation. There is no basis for relief under Rule 60(b)(3) or (6) because, as I have already concluded, the Trustees and their staff properly administered the proof of claims program and performed their fiduciary duties properly without engaging in any improper conduct in the Plan and confirmation proceedings.

■ It is contended that PCTC's "misconduct contributed to, if not caused, petitioners' failure to learn of their antitrust claims prior to entry of the Consummation Order." This type of contention would not ordinarily be the basis for relief from a judgment under Rule 60(b) because the omission of a claim does not affect the validity of a judgment on another claim. Instead, the omission of a claim gives rise to the possibility *res judicata* will be an affirmative defense to a second action by the party who omitted the claim. A given jurisdiction may recognize an exception to the *res judicata* doctrine when a party's failure to litigate a claim in the first action was attributable to conduct of the opposing party in the first action. *Restatement of Judgments 2d*, § 28, Comment J. Whether or not there has been any previous litigation, the lack of knowledge of or reason to know of a claim may, depending on the applicable state or federal law, toll the statute of limitations. Petitioners are relying on the federal tolling doctrine in their Cleveland actions.

■ When a jurisdiction establishes an exception to the policy of finality underlying the doctrine of *res judicata* or the statute of limitations, the purpose is to achieve justice among the parties by preserving potentially valid claims.

■ Section 77 of the Bankruptcy Act accepts the underlying state and federal law which determines whether a claim is barred by the doctrine of *res judicata* or the statute of limitations. An entirely independent set of requirements are imposed

by § 77 in order to carry out the policies of the bankruptcy law. Claims must be filed in a § 77 reorganization within the time fixed by the reorganization court, subject to the liberal provision of § 77(c)(7) for filing claims late. Under § 77 and the Bankruptcy Code, claims which are asserted after confirmation and consummation are discharged and there is no exception made for claims which were unknown to a claimant until after consummation of the Plan.[11]

■ Thus, assuming Pinney and Litton neither knew nor had reason to know of their antitrust claims because of the alleged conspiracy, their lack of knowledge would not be a ground for exemption from the discharge. The record has been analyzed in detail to determine whether there are other circumstances which might warrant a judicially forged exception to the discharge. If petitioners had asserted their claims before the Plan was approved or even if they asserted their claims before consummation, relief under § 77(c)(7) might well have been granted. Unfortunately, that was not what happened, and the record does not reveal conduct by PCTC, over and above the alleged conspiracy itself, which permits the application of some form of equitable estoppel or other finding adequate to overcome the general policy that a § 77(f) discharge is final.

■ Even if the record supported the conclusion that the general policies of § 77 might be subordinated to the interests of Pinney and Litton, the interests of those protected by the policies of § 77 must be considered in the context of the Plan. Under the Plan, unsecured creditors receive a certificate of beneficial interest equal to 30% of their liquidated claim. The certificates of beneficial interest have been redeemed from the proceeds of the Valuation Case litigation and unsecured claims now receive cash in lieu of a certificate of beneficial interest. Thirty-five percent of the original common stock to be issued on consummation of the Plan, 8,103,813 shares, was allocated under the Plan to general unsecured creditors.[12] The distribution of this pool of stock could not be completed at one time because a large number of unsecured claims had not been liquidated by October of 1978. The unliquidated claims were estimated and the pool was allocated on the basis one share per $96 of claim. PCC, in accordance with the Plan, was able to reduce the amount of claim per share to $55.30 once a substantial portion of the unliquidated claims were liquidated. Those who received the original distribution, whether or not they still retained their stock, received a supplemental equalizing distribution of stock. The Plan requires that when all or substantially all of the claims are liquidated, there will be another final distribution. PCC has estimated, based upon the facts available in mid-1983, that approximately 550,000 shares of the stock pool will be available for a final distribution.

Any distribution of the projected balance of the stock to petitioners would be at the direct expense of the unsecured claimants who would be denied a share of the final distribution. Use of authorized but unissued stock to satisfy any claim of petitioners would dilute the stock distributed under the Plan to both secured and unsecured creditors, and to those who received stock through the Chapter XI plan of the Penn Central Company.[13] Of course, persons who purchased or acquired PCC stock on

---

11. On arguably more favorable facts Judge Ditter of this Court has held that the § 77(f) discharge barred former Reading employees from asserting asbestosis claims against the reorganized company. *Schweitzer v. Consolidated Rail Corporation,* 36 B.R. 469 (D.C.E.D.Pa.1984).

12. Included in the group receiving stock distributions from the pool of stock were certain other creditors of PCTC and the Secondary Debtors.

13. Penn Central Company, the parent of PCTC, held all of PCTC's common stock. Ten percent of the Penn Central Corporation's common stock was allocated to the Penn Central Company, and that stock was distributed through the Penn Central Company's Chapter XI plan to thousands of stockholders of Penn Central Company.

the public market or in the ordinary course of business transactions would also be adversely affected by any dilution through the issuance of more stock. Although the certificate of beneficial interest aspect of the distribution to unsecured creditors raises a different issue, any significant cash distribution would be at the expense of the present owners and creditors of PCC. Moreover, because there was no disclosure of Pinney and Litton's claims, all present owners and creditors of PCC would be unfairly treated if their reliance on the bankruptcy laws were not fully recognized.

In sum, if it is appropriate to analyze the comparative situations of the petitioners versus those who now hold interests of any kind in PCC, the balance must be struck consistently with the policy of § 77. Any relief granted in favor of petitioners in this proceeding would have the possibility of ultimately prejudicing PCC's present owners and creditors and, therefore, equitable relief in favor of petitioners from the Order of Confirmation is not appropriate.

IV. SUMMARY

Petitioners originally proceeded on the theory that PCC may be liable to them outside the Plan as a successor to PCTC. In the Memorandum accompanying Order No. 4206, I concluded that under no circumstances could PCC be liable outside the Plan. I adhere to that conclusion. Possible participation by petitioners under the Plan remained to be resolved.

No statutory or constitutional defects in the proof of claims program have been demonstrated and therefore the discharge under § 77(f) is effective to bar petitioners' claims. Equitable relief beyond that permitted by § 77(c)(7) is not available as a matter of law, but even assuming such relief is within the equitable power of this court, no showing has been made which justifies equitable relief. The net effect of these conclusions is to protect the participants under the Plan and the other present owners and creditors of PCC from a diminution or dilution of their interests.

Petitioners have labored vigorously to focus the dispute as one between injured parties and the alleged wrongdoer. The alleged wrongdoer, PCTC, no longer exists. The reorganization process has resulted in a reorganized company that is not the corporate successor in the ordinary sense. But for the reorganization process creditors would have been satisfied on a first-come first-serve basis and petitioners would have suffered the same result as they do under the § 77 discharge of PCTC liabilities and the free and clear transfer of PCTC's assets to PCC. Instead of permitting the exaggerated economic losses which would have resulted from the sale of PCTC's assets, Congress substituted § 77. Section 77 does not, however, create any risks. Petitioners or any other creditors who did not know of their claims until well after PCTC was in extreme financial difficulty were subject to the risk that when they did learn of their claims, PCTC would be judgment-proof. Substitution of the reorganization process enhances the recovery of those who participate under the Plan. The scheme of § 77 is a constitutional and an appropriate way for Congress to seek to minimize the consequences of economic failure.

Petitioners' procedural due process arguments have already been considered and rejected in Section II. Petitioners seem to acknowledge that Congress has the power to discharge claims provided adequate notice is given. In any event, there is no arguable ground for asserting that the discharge of claims is beyond the bankruptcy power, at least when the discharged claims arise after the bankruptcy legislation which enacts the discharge provision. *U.S. v. Security Indus. Bank*, 459 U.S. 70, 103 S.Ct. 407, 74 L.Ed.2d 235 (1982); *Regional Reorganization Act Cases*, 419 U.S. 102, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974); *Wright v. Vinton Branch of the Mountain Trust Bank*, 300 U.S. 440, 57 S.Ct. 556, 81 L.Ed. 736 (1937).

An order denying the petition will be entered. The parties will be given an opportunity to comment on the terms of an order concerning the termination of the

Cleveland actions. Simple dismissal of those actions may or may not be appropriate.