771 F.2d 762
 1985-2 Trade Cases 66,767, 13 Collier Bankr.Cas.2d 422,
Bankr. L. Rep. P 70,723
 In re PENN CENTRAL TRANSPORTATION COMPANY.
Appeal of PINNEY DOCK & TRANSPORT COMPANY, Litton
Industries, Inc., Litton Systems, Inc., Litton
Great Lakes Corporation and Erie Marine, Inc.
 Nos. 84-1355, 84-1391.
 United States Court of Appeals,
Third Circuit.
 Argued March 20, 1985.
Decided Aug. 29, 1985.
As Amended Sept. 23, 1985.
 
 Harry C. Nester, Hahn, Loeser, Freedheim, Dean & Wellman, Cleveland, Ohio, Richard T. Colman, P.C. (argued), Robert G. Abrams, John A. Conkle, Howrey & Simon, Washington, D.C., Theodore F. Craver, Richard J. Tannenbaum, Litton Industries, Inc., Beverly Hills, Cal., Bruce W. Kauffman, Lawrence G. McMichael, Dilworth, Paxson, Kalish & Kauffman, Philadelphia, Pa., for appellants.
 Charles A. Horsky, Paul R. Duke, Covington & Burling, Washington, D.C., Kenneth N. Hart (argued), C. Evan Stewart, Curtis S. Gimson, Donovan, Leisure, Newton & Irvine, New York City, Robert J. Siverd, Carl Helmetag, Jr., The Penn Cent. Corp., Philadelphia, Pa., for appellees.
 Before SEITZ, and HIGGINBOTHAM, Circuit Judges and WEBER, District Judge.*
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 In this consolidated appeal, Pinney Dock & Transport Company ("Pinney"), Litton Industries, Inc., Litton Systems, Inc., Litton Great Lakes Corporation, and Erie Marine, Inc. ("Litton") appeal from final bankruptcy orders of the United States District Court for the Eastern District of Pennsylvania. The court denied their petition for leave to pursue antitrust actions in another forum against Penn Central Corporation ("PCC"), the reorganized company formed in the railroad reorganization proceedings of Penn Central Transportation Company ("PCTC") and several secondary debtors pursuant to section 77 of the Bankruptcy Act, formerly codified at 11 U.S.C. Sec. 205 (repealed 1978). Pinney and Litton allege that, although they received notice of the reorganization proceedings, their claims for damages based on an antitrust conspiracy were fraudulently concealed from them and that they should therefore be allowed to prosecute those claims now. We will affirm the district court for the reasons expressed in this opinion.
 
 I.
 A.
 
 2
 On June 21, 1970, PCTC filed a petition for railroad reorganization under section 77.[1] Section 77(c)(7) provides in pertinent part that the court shall "fix a reasonable time within which the claims of creditors may be filed or evidenced and after which no claim not so filed or evidenced may participate" in the Plan of Reorganization ("Plan")[2] except on order for cause shown. Accordingly, on February 18, 1971, the district court entered Order No. 164, requiring all proofs of claims against PCTC arising prior to the date of the reorganization petition, except those specifically exempted, to be filed with the court by June 1, 1971. Appendix at 1-32. In Order No. 914, entered September 12, 1972, the court also established a procedure for creditors who had been notified of the proof of claim requirement, and who had failed to comply with the above bar date, to attempt to show good cause why their claims should not be excluded from participation in the Plan. Appendix at 33-44. Pinney, Litton, and Pinney's parent corporation, Standard Slag Co., received notice by mail of Order Nos. 164 and 914. Appendix at 580-82. Litton and Standard Slag Co. also filed proofs of claims which were not based upon alleged antitrust violations. Pinney did not participate in the proof of claim procedure.
 
 
 3
 On March 17, 1978, the district court approved the Plan as amended in its opinion. Matter of Penn Central Transp. Co., 458 F.Supp. 1234, 1346 (E.D.Pa.1978). Overwhelming majorities of all except three creditor classes then voted to accept the Plan. Litton and Standard Slag Co. were among the creditors who accepted the Plan. On August 17, 1978, the district court entered the Confirmation Order No. 3707 and the Consummation Order No. 3708, setting October 24, 1978, as the consummation date. Matter of Penn Central Transp. Co., 458 F.Supp. 1364 (E.D.Pa.1978).[3]
 
 B.
 
 4
 The Consummation Order constituted the final decree in the reorganization process and, pursuant to section 77(f), contains the following relevant sections:
 
 
 5
 3.06. Discharge of Release of Claims. Subject to the provisions of Section 6.03 below relating to the payment, assumption or satisfaction by the Reorganized Company of certain claims, the Debtors and the Trustees of the properties of the Debtors shall, as of the Consummation Date, be discharged and released forever from
 
 
 6
 (a) all obligations, debts, liabilities and claims against any of the Debtors, whether or not filed or presented, whether or not approved, acknowledged or allowed in these proceedings and whether or not provable in bankruptcy....
 
 
 7
 6.03. Assumed Obligations. The claims of creditors, claimants and stockholders in respect of obligations of any of the Debtors or Trustees of the properties of the Debtors will be satisfied as provided in the Plans, subject, however, to the provisions of this Order relating to the payment or satisfaction of such claims. Any timely-filed claim ... against any of the Debtors or Trustees and contingent claims in respect of guarantees by any of the Debtors of bonds of non-sudsidiary companies, against any of the Debtors or their Trustees included in a class provided for in the Plans but not liquidated in amount, settled, determined, classified, approved, acknowledged, allowed or adjudicated to be valid until after the Consummation Date will be satisfied pursuant to the Plans in the same manner as if such claim had been so adjudicated or otherwise liquidated prior to the Consummation Date. Without limiting the generality of the foregoing, the following claims and obligations [not pertinent here] shall be assumed and satisfied by the Reorganized Company....
 
 
 8
 7.02. Injunction. All persons, firms, governmental entities and corporations, wherever situated, located or domiciled, are hereby permanently restrained and enjoined from instituting, prosecuting or pursuing, or attempting to institute, prosecute or pursue, any suits or proceedings, at law or in equity or otherwise, against the Reorganized Company ... or against the assets or property of the Reorganized Company ... directly or indirectly, on account of or based upon any right, claim or interest of any kind or nature whatsoever which any such person, firm, governmental entity or corporation may have in, to or against any of the Debtors, the Trustees of the Properties of the Debtors or any of their assets or properties ... and from interfering with or taking steps to interfere with the Reorganized Company ... or the operation of the properties or the conduct of the business of the Reorganized Company ... by reason of or on account of any obligation or obligations incurred by any of the Debtors or any of their Trustees in these proceedings, except the obligations imposed on the Reorganized Company ... by the Plans and this Order or reserved for resolution or adjudication by this Order. All persons, firms, governmental entities and corporations, wherever situated, located or domiciled, are hereby restrained and enjoined from instituting, prosecuting or pursuing or attempting to institute, prosecute or pursue any suit or proceedings, at law or in equity or otherwise, against any of the Debtors or any of their assets or property, directly or indirectly, except such suits or proceedings as may be for the purpose of carrying out this Order by consummating the Plans....
 
 
 9
 7.04. Reservation of Jurisdiction. From and after the Consummation Date, the Court hereby reserves jurisdiction, which shall be exclusive to the extent that under applicable law such jurisdiction is presently exclusive:
 
 
 10
 * * *
 
 
 11
 * * *
 
 
 12
 (h) To consider and take appropriate action with respect to the matters referred to in Section 7.02 above, including action to enforce the injunctive provisions of that Section;
 
 
 13
 7.06. Termination of Proceedings and Final Decree. Except as provided in Section 7.04 above ... all jurisdiction of this Court in or by reason of these proceedings shall be terminated and these proceedings shall be closed effective as of the Consummation Date.
 
 
 14
 See Appendix at 81-102. Section 77(f) provides that:
 
 
 15
 Upon confirmation by the judge, the provisions of the plan and of the order of confirmation shall ... be binding upon the debtor, all stockholders thereof, including those who have not, as well as those who have, accepted it, and all creditors secured or unsecured, whether or not adversely affected by the plan, and whether or not their claims shall have been filed, and, if filed whether or not approved, including creditors who have not, as well as those who have, accepted it.... The property dealt with by the plan, when transferred and conveyed ... to the other corporation ... provided for by the plan, [here PCC], ... shall be free and clear of all claims of the debtor, its stockholders and creditors, and the debtor shall be discharged from its debts and liabilities, except such as may consistently with the provisions of the plan be reserved in the order confirming the plan or directing such transfer and conveyance or retention ....
 
 
 16
 11 U.S.C. Sec. 205(f).
 
 
 17
 Notwithstanding the discharge and injunctive provisions of Section 77(f) and the Consummation Order, Pinney and Litton filed actions in the United States District Court for the Northern District of Ohio on September 17, 1980, and March 5, 1981, respectively, alleging violations of antitrust laws by PCC, its predecessor railroad companies, and five other railroads ("Cleveland actions").[4] In its complaint, Pinney alleged that the defendants effectively prevented it from handling iron ore at the Pinney dock in Ashtabula, Ohio, because from the middle 1950's throughout the 1970's, they were members of a conspiracy to deny it a competitive rail line haul rate. Litton alleged in its complaint that, by 1973, it had been driven out of the business of building self-unloading vessels because from the middle 1960's the members of the conspiracy would not handle Litton's ships at their docks, had unreasonably high unloading charges, and/or would not enter a leasing or purchasing agreement to allow Litton to use dock facilities which could accomodate Litton ships. All the defendants in the Cleveland actions moved to dismiss on several grounds.[5] Following extensive discovery, the district court ruled upon summary judgment motions. Under FED.R.CIV.P. 42(b), the court considered separately PCC's contention that Pinney and Litton were enjoined from pursuing an action against PCC by section 7.02 of the Consummation Order. The court granted PCC partial summary judgment as to alleged anticompetitive acts occurring after the October 24, 1978 consummation date. As to those allegations based upon the actions of PCTC or its predecessors, however, the court found that under sections 7.02 and 7.04(h) of the order, Pinney and Litton would have to obtain the permission of the reorganization court prior to any further prosecution of their antitrust claims against PCC. See Pinney Dock & Transport Co. v. Penn Central Corp., et al., 1982-83 Trade Cas. (CCH) p 65.054 (N.D.Ohio 1982).
 
 
 18
 Pinney and Litton therefore filed a petition for leave to pursue the Cleveland actions on January 25, 1983, with the district court below. The court conducted two hearings, held April 12 and November 9, 1983. After the first hearing, the court entered Memorandum and Order No. 4206 on September 20, 1983, finding that Pinney and Litton could not ignore the provisions of section 77(f), therefore PCC could be liable for PCTC's debts only as provided for in the Plan. Appendix at 627-37. The court also granted their request for a second evidentiary hearing on their allegation of fraudulent concealment. Appendix at 635. The court denied their petition on May 22, 1984, Matter of Penn Central Transp. Co., 42 B.R. 657 (E.D.Pa.1984), and on June 22, 1984, permanently enjoined them from prosecuting the Cleveland actions as well as from prosecuting any other action for damages or other relief based upon bankruptcy claims which arose prior to the 1978 Consummation Order. Appendix at 1547-49. On August 13, 1984, this court consolidated the notices of appeal, filed June 20 and 28, 1984, which followed the orders below.
 
 II.
 
 19
 An antitrust conspiracy, such as the one alleged by Pinney and Litton in the Cleveland actions, accrues when a defendant commits an act in furtherance of the conspiracy that injures the plaintiff and results in ascertainable damages. Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971), reh'g denied, 401 U.S. 1015, 91 S.Ct. 1247, 28 L.Ed.2d 552 (1971). Moreover, such actions constitute bankruptcy "claims" within the meaning of section 77 since they are based upon federal statutes that create substantive obligations wholly separate from bankruptcy law. See Vanston Bondholders Protective Committee v. Green, 329 U.S. 156, 170, 67 S.Ct. 237, 243, 91 L.Ed. 162 (1946) (Frankfurter, J., concurring). The court below determined, and Pinney and Litton do not dispute, that their "claims" against PCTC due to the alleged antitrust conspiracy existed prior to and during the reorganization proceedings. We therefore must begin with the assumption that their claims have been discharged by section 77(f) and the provisions of the Consummation Order. See Duryee v. Erie R.R. Co., 175 F.2d 58, (6th Cir.), cert. denied, 338 U.S. 861, 70 S.Ct. 103, 94 L.Ed. 527 (1949).
 
 
 20
 The Duryee case also involved a creditor who attempted to assert a claim against a railroad which had completed its reorganization pursuant to section 77. In holding that the creditor's claim was discharged, the court spoke about the importance of finality in section 77 proceedings:
 
 
 21
 Since Section 77, sub. f. of the Bankruptcy Act provides that the property dealt with by the plan, when conveyed by the debtor ... pursuant to the plan, shall be free and clear of claims of the debtor, its stockholders and creditors, and the debtor shall be discharged from its debts and liabilities "except such as may consistently with the provisions of the plan be reserved in the order confirming the plan or directing such transfer and conveyance or retention," it is clear that any reservation of jurisdiction by the reorganization court is limited to claims provided for in the reorganization plan. It unquestionably follows that the "bar" order could not be construed to permit the assertion, at the present time, of a claim existing prior to the reorganization proceedings.
 
 
 22
 * * *
 
 
 23
 * * *
 
 
 24
 We are in complete agreement with the observations made by the district court in its opinion dismissing appellant's action to the effect that the purpose of the bankruptcy law and the provisions for reorganization could not be realized if the discharge of debtors were not complete and absolute; that if courts should relax the provisions of the law and facilitate the assertion of old claims against discharged and reorganized debtors, the policy of the law would be defeated; that creditors would not participate in reorganizations if they could not feel that the plan was final; and that it would be unjust and unfair to those who had accepted and acted upon a reorganization plan if the court were thereafter to reopen the plan and change the conditions which constituted the basis of its earlier acceptance.
 
 
 25
 175 F.2d at 61, 63.
 
 
 26
 Thus, we note that the facts here and in Duryee are different from those in this court's recent decision in Schweitzer et al. v. Consolidated Rail Corp. et al., 758 F.2d 936 (3d Cir.1985), petition for cert. filed, 54 U.S.L.W. 3044 (U.S. June 26, 1985) (No. 84-2008). In Schweitzer, this court reversed the decisions of the district courts and held that, since a cause of action under the Federal Employer's Liability Act, 45 U.S.C. Secs. 57-60 (1948), does not accrue until an injury has manifested, the lawsuits of former railroad employees seeking damages for injuries due to asbestos-related diseases which did not become manifest until after the consummation of reorganization, do not constitute "claims" which are dischargable under section 77.758 F.2d at 941, 944.[6]
 
 
 27
 On appeal, Pinney and Litton argue that their claims were unknown and undisclosed to them during the reorganization proceeding due to PCTC's fraudulent concealment of the conspiracy. They seek an exemption from the Consummation Order because they contend that they did not receive constitutionally adequate notice in the reorganization proceedings,[7] and because they believe they have established sufficient grounds for equitable relief from the order under FED.R.CIV.P. 60(b)(3) and (6). We will discuss the two arguments separately.
 
 A.
 
 28
 In Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 314-15, 70 S.Ct. 652, 657-58, 94 L.Ed.2d 865 (1950) the Supreme Court stated that:
 
 
 29
 An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. The notice must be of such nature as reasonably to convey the required information ... and it must afford a reasonable time for those interested to make their appearance.... But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met, the constitutional requirements are satisfied.
 
 
 30
 (citations omitted). Thus the purpose of the notice requirement is to advise individuals who will be affected by the outcome of any proceeding of the impending hearing so that they can take steps to safeguard their interests. Memphis Light Gas & Water Division v. Craft, 436 U.S. 1, 14, 98 S.Ct. 1554, 1563, 56 L.Ed.2d 30 (1978). Greene v. Lindsey, 456 U.S. 444, 451, 102 S.Ct. 1874, 1878, 72 L.Ed.2d 249 (1982). The notice requirement is not necessarily intended to advise them of the nature of those interests.
 
 
 31
 As the court below noted, the PCTC trustees "completed an exhaustive search of their accounting records in an effort to send notice of the proof of claim program to anyone who might have had a claim." 42 B.R. at 665, fn. 4. Moreover, despite their opportunity to gain information through extensive discovery, Pinney and Litton admit that the trustees had no knowledge of facts which would suggest that the instant alleged antitrust claims existed. 42 B.R. at 664-65. Pinney and Litton nevertheless received mail notice of Order No. 164, the standard proof of claim forms and schedules, and subsequent orders regarding the proof of claim program because of their other claims.
 
 
 32
 All non-exempt creditors were required by the terms of the above orders to file their claims by the bar date of June 1, 1971, or show cause why their claims should not be excluded from participation under the Plan. Appendix at 4-5, 34-36. If a claim did not fall into one of the enumerated schedule categories, the claimant was still required to provide a general description of the claim. Appendix at 7-13. Pinney and Litton have never filed such a general description of their antitrust claims.
 
 
 33
 Pinney and Litton argue that the above notice procedure was based upon the assumption that they would have knowledge of their unknown claims or would have access to facts from which they could discover those claims. They further argue that, while this assumption may be constitutionally proper and adequate for ordinary commercial claims, it was completely inadequate for their antitrust claims because they were not effectively advised of the effect that reorganization would have on them. Despite the fact that nothing in section 77 requires trustees to provide information to creditors as to the character of their claims, they rely on the reasoning in City of New York v. New York, New Haven & Hartford R.R. Co., 344 U.S. 293, 73 S.Ct. 299, 97 L.Ed. 333 (1953), In re Harbor Tank Storage Co., Inc., 385 F.2d 111 (3d Cir.1967), and Reliable Electric Co., Inc. v. Olson Construction Co., 726 F.2d 620 (10th Cir.1984). These cases are inapposite. They do not support the contention that due process required that the PCTC trustees should have notified Pinney and Litton that they had bankruptcy claims based specifically upon an antitrust conspiracy and, since the trustees did not provide them with such specific notice, their claims are not barred.
 
 
 34
 City of New York, involved a reorganization under section 77. The district court issued an order requiring the filing of claims before the bar date and that the trustees send mail notice of the order only to certain creditors. The city knew about the reorganization proceedings, but received only constructive notice of the order by publication, and did not file its claims for local improvement liens on the railroad's property before the bar date. The Supreme Court held that the city did not receive reasonable notice under section 77(c)(8) since the railroad and the trustees knew about the city's liens and failed to provide it with mail notice of the court's order. 344 U.S. at 296-97, 73 S.Ct. at 301.
 
 
 35
 In the Harbor Tank case, Murray Oil Products Co. appealed the decision of the district court denying its petition to file a claim against Harbor Tank after its plan of reorganization had been confirmed in proceedings pursuant to Chapter X of the Bankruptcy Act, 11 U.S.C. Secs. 501-676 (1964). Although Murray Oil knew about the reorganization proceedings and the trustee for Harbor Tank knew about its claim, the trustee did not provide mail notice of the proof of claim bar date, the summary of the reorganization plan, or of the hearings to consider objections and amendments to the plan. 385 F.2d at 112. This court held that "[t]he rejection of Murray Oil's petition in the face of the inexplicable failure of the trustee to give Murray Oil any of the various notices required by Chapter X--despite the trustee's actual knowledge of Murray Oil's unsatisfied, meritorious claim--constitutes a denial of due process." 385 F.2d at 114. The notice that the creditor was required to receive was of the court's hearings and other actions in the reorganization proceedings.
 
 
 36
 The reorganization process is dependent on the proper notification to creditors and other interested parties of all important steps in the proceeding so that they may take such steps as necessary to safeguard their interests. Although notice by publication may be deemed to satisfy the requirements of the Act in some situations, certainly such notice is insufficient where, as here, the trustee knows both the existence and address of a creditor. And the fact that a creditor knows of the initiation of reorganization proceedings does not of itself place a burden on the creditor to file an appearance or claim in the proceeding before receiving notice to do so: a creditor has every right to assume that he will be sent all the notices to which he is entitled under the Act.
 
 
 37
 Id. at 115 (emphasis added).
 
 
 38
 Reliable Electric also involved a known creditor who was aware of the bankruptcy reorganization but, due to the trustee's actions, never received notice of any of the proceedings. 726 F.2d at 621. In this case the tenth circuit held that:
 
 
 39
 the discharge of a claim without reasonable notice of the confirmation hearings is violative of the fifth amendment of the United States Constitution. In our view, this holding is supported by the Supreme Court's decisions in Mullane, supra, and New York, supra.
 
 
 40
 Id. at 623 (emphasis added). The court stated that "the reorganization process depends upon all creditors and interested parties being properly notified of all vital steps in the proceeding so they may have the opportunity to protect their interests." Id.
 
 
 41
 Unlike the facts in the above cases, Pinney and Litton 1) received mail notice of the proof of claim program and the bar date, 2) chose whether or not to participate in the reorganization proceedings as to their other claims, and 3) sought relief from the district court long after the consummation of reorganization. They further admit that the trustees did not know any facts about the alleged conspiracy. Under these circumstances, we agree with the district court that effect must be given to the policy of finality in section 77 reorganizations and we find that Pinney and Litton received all the notice that they were due under the Constitution.
 
 B.
 
 42
 Pinney and Litton contend that the district court abused its discretion in failing to grant their request for equitable relief from the Consummation Order under FED.R.CIV.P. 60(b)(3) and (6). As applied to Section 77 by Rule 8-703(a)(5) of the Rules of Bankruptcy Procedure (1976), Rule 60(b) provides that:
 
 
 43
 On motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: ... (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; ... or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken, except that a motion to reopen a case or for reconsideration of an order allowing or disallowing a claim against the debtor entered without a contest is not subject to the one-year limitation.
 
 
 44
 Assuming that the district court did have the equitable power under this section or otherwise to exempt them from the order and the discharge provisions of section 77(f), we agree that relief was inappropriate here.
 
 
 45
 In support of their request for relief, Pinney and Litton relied in part upon their evidentiary submission of documents and portions of deposition testimony. Briefly, this evidence indicated that, prior to the 1950's, most of the iron ore from mines in the Great Lakes region traditionally was transported in raw form by ships called "bulkers" over the Great Lakes to receiving docks along Lake Erie, and then by rail carriers to the steel mills. The ore was removed from the holds of bulkers by heavy dockside cranes called "huletts". Railroad companies owned most of the docks on Lake Erie and these docks were designed for unloading by huletts. The railroads published separate unloading charges for lifting ore from the hold to the side of the ship, lowering ore to railroad cars or to containers used for storage, and moving ore from dock storage to railroad cars. They also published commodity rail line haul rates for transportation from the docks to the steel mills. In the 1950's, however, the producers of iron ore developed a method of converting raw iron ore into pellets for shipment. This development made it possible to transport the iron ore pellets in self-unloading vessels, which used on-board conveyor belt systems to move cargo from their holds to a dock. Most of the railroads informally quoted the same unloading charges for self-unloaders as bulkers, without establishing a tariff to that effect even though huletts were not needed to lift ore from their holds.
 
 
 46
 Pinney sought to handle the pellets from self-unloading ships at its own dock facilities, which were located next to a dock originally owned by one of PCTC's predecessors, New York Central Railroad Company. The railroad charged a much higher line haul rate from the Pinney dock to the steel mills, however, than from its own dock. Beginning in 1957, Pinney unsuccessfully attempted to obtain a more favorable rate, and in 1969, filed an informal complaint with the Interstate Commerce Commission challenging the rate difference. The Commission's informal mediation was also unsuccessful. Pinney then hired attorneys to investigate whether it should file a formal complaint or take other legal action against PCTC. By the summer of 1975, Pinney began to move iron ore from its dock by truck because negotiations with the railroads had proved to be fruitless.
 
 
 47
 Litton sought to build and market larger, technologically advanced self-unloaders and self-unloading equipment for sale as well as for its shipping line subsidiary, Wilson Marine Transit Co. Beginning in April 1968, Litton and PCTC attempted to negotiate an agreement to use PCTC's Whiskey Island property, located in the Cleveland harbor, to construct a dock and storage area capable of handling Litton's new ships. Litton could not establish a firm agreement with PCTC, and thus explored alternatives with other railroads, particularly the C & O.
 
 
 48
 Between 1968 and 1972, Litton and C & O discussed the possibility of using C & O docks at either Fairport, or Lorain, Ohio. Although C & O was amenable to quoting a lower unloading charge for self-unloaders in the 1972 season, all the other railroads objected. C & O then held a railroad meeting in April, 1971, to discuss 1972 charges. Prior to the meeting, Litton told C & O that it objected to the other railroads taking part in C & O's plans with Litton and to their colluding to determine strategy. At the meeting, PCTC told C & O that a reduction in self-unloader charges would not be advisable. C & O quoted and Litton rejected the same higher charge for the 1972 season. Litton then suggested that it lease a portion of C & O's dock facilities in Lorain. C & O chose not to enter into a leasing agreement in part because of PCTC's advice against such an arrangement. By August, 1973, Litton had stopped building new self-unloading vessels and was seeking a buyer for its shipyard.
 
 
 49
 The district court stated that there was evidence to support the theory of a conspiracy. 42 B.R. at 670-72. Despite evidence in the record to the contrary,[8] the court also assumed that Pinney and Litton did not know and did not have "reason to know of their antitrust claims because of the alleged conspiracy." Id. at 675. The determination of whether there was an antitrust conspiracy is before the court in the Cleveland actions, and regardless of whether there actually was a conspiracy, the issue before the court below was whether PCTC engaged in any fraud or other misconduct which prevented Pinney and Litton from filing proofs of claim prior to the consummation date. The court found no direct evidence that PCTC acted in bad faith towards either Pinney or Litton during the reorganization proceedings. Id. at 670-72. The court also found that "the record does not reveal conduct by PCTC, over and above the alleged conspiracy itself, which permits the application of some form of equitable estoppel or other finding adequate to overcome the general policy that Sec. 77(f) discharge is final." Id. at 675.
 
 
 50
 Pinney and Litton also relied upon the June 21, 1983 denial of motions for summary judgment filed by PCC's co-defendants in the Cleveland actions. See Pinney Dock & Transport Co. et al. v. Penn Central Transp. Co. et al., 1982-83 Trade Cas. (CCH) p 65.607 (N.D.Ohio 1983), aff'd on reconsideration, 600 F.Supp. 859 (N.D.Ohio 1984) and Pinney Dock & Transport Co. et. al. v. Penn Central Transp. Co., et al., 1982-83 Trade Cas. (CCH) p 65.608 (N.D.Ohio 1983). The motions were based in part upon the co-defendants' argument that the actions were barred by the four-year statute of limitations of section 4B of the Clayton Act, 15 U.S.C. Sec. 15b (1976). Based on evidence similar to that presented below, the Cleveland court found that there was a genuine issue of material fact as to whether the defendants had fraudulently concealed the conspiracy, thus tolling the statute of limitations. See Bailey v. Glover, 88 U.S. 342, 22 L.Ed. 636 (1874). We note, however, that the legal standard for viewing the evidence was quite different for the court in the Cleveland actions than for the district court here. Rather than viewing the evidence in the light most favorable to Pinney and Litton, the court below had to determine whether they had met their burden of proving by clear and convincing evidence conduct which prevented them from filing their alleged antitrust claims. Brown v. Pennsylvania R.R. Co., 282 F.2d 522, 527 (3d Cir.1960), cert. denied, 365 U.S. 818, 81 S.Ct. 690, 5 L.Ed.2d 696 (1961). The court reviewed the proof of claim program and found that the PCTC trustees and their staff engaged in no such misconduct. 42 B.R. at 674. The court also reviewed the evidence submitted by the parties and found no fraud or other misconduct by PCTC justifying relief. Id. at 675. We have reviewed the record and agree with the court below.[9] We therefore find that the district court did not commit an error of law, and based on the evidence in this case, it did not commit an abuse of discretion, in denying the requested relief.[10]
 
 CONCLUSION
 
 51
 We will therefore affirm the decision of the district court for the reasons stated in the above opinion.
 
 
 
 *
 Honorable Gerald J. Weber, United States District Court for the Western District of Pennsylvania, sitting by designation
 
 
 [1]
 The district court's opinion, Matter of Penn Central Transp. Co., 458 F.Supp. 1234 (E.D.Pa.1978), provides an extensive history of the reorganization proceedings. See also Matter of Penn Central Transp. Co., 596 F.2d 1127, 1130-35 (3d Cir.1979)
 
 
 [2]
 Section 77(b) provides inter alia:
 A plan of reorganization within the meaning of this section ... shall include provisions modifying or altering the rights of creditors generally, or of any class of them, secured or unsecured,....
 * * *
 The term "creditors" shall include, for all purposes of this section all holders of claims of whatever character against the debtor or its property, whether or not such claims would otherwise constitute provable claims under this Act, ....
 The term "claims" includes debts, whether liquidated or unliquidated, securities ..., liens, or other interests of whatever character.
 11 U.S.C. Sec. 205(b) (repealed 1978).
 
 
 [3]
 This court affirmed the approval and confirmation of the Plan in three separate opinions. See 596 F.2d 1102 (3d Cir.1979) (affirming in part and remanding for modification of the distribution to two indenture trustees), 596 F.2d 1127 (3d Cir.), cert. denied, 444 U.S. 834, 100 S.Ct. 67, 62 L.Ed.2d 44 (1979) (affirming and rejecting the objections of certain secured creditors), and 596 F.2d 1155 (3d Cir.), cert. denied, 444 U.S. 835, 100 S.Ct. 68, 62 L.Ed.2d 45 (1979) (dismissing the appeal of certain shareholders and affirming two orders in the related Chapter XI proceedings)
 
 
 [4]
 PCC's co-defendants are Baltimore & Ohio R.R. Co. ("B&O"), Bessemer & Lake Erie R.R. Co. ("B&LE"), CSX Corp. and Chessie Systems, Inc. ("Chessie"), Chesapeake & Ohio Ry. Co. ("C&O"), and Norfolk & Western Ry. Co. ("N&W")
 
 
 [5]
 The defendants contended in their motions that the actions should be dismissed because of: 1) the injunctive provisions of the Consummation Order (PCC only); 2) the lack of standing or a direct or cognizable injury (B & LE only); 3) the four-year statute of limitations in section 4B of the Clayton Act, 15 U.S.C. Sec. 15b (1976); 4) the doctrine established in Keogh v. Chicago & Northwestern Ry., 260 U.S. 156, 43 S.Ct. 47, 67 L.Ed. 183 (1922); 5) the relief requested having been rendered moot as well as barred by laches; 6) the immunity of section 5a of the Interstate Commerce Act, 49 U.S.C. Sec. 5b (1976), from prosecution under antitrust laws; and 7) the primary jurisdiction of the Interstate Commerce Comm. In two opinions filed June 21, 1983, the Cleveland court denied the motions of the PCC's co-defendants. See, Pinney Dock & Transport Co., et al. v. Penn Central Transp. Co. et al., 1982-83 Trade Cas. (CCH) p 65.607 (N.D.Ohio 1983), aff'd on reconsideration, 600 F.Supp. 859 (N.D.Ohio 1984), and Pinney Dock & Transport Co., et al. v. Penn Central Transp., et al., 1982-83 Trade Cas. (CCH) p 65.608 (N.D.Ohio 1983)
 
 
 [6]
 Since we held that the appellants in the Schweitzer case did not have dischargable "claims", we did not reach such questions as whether the appellants' due process rights would be violated by the discharge provisions of subsection (f) and the consummation orders, or whether this court could grant equitable exemptions from those provisions
 
 
 [7]
 Pinney and Litton also argued below that they did not receive adequate notice under section 77(c) and Rule 8-208 of the Rules of Bankruptcy Procedure (1976). As the district court noted, however, they concede the PCTC trustees "had no knowledge of any facts which suggested that the petitioners had antitrust claims", and the court found as a matter of law and fact that the trustees completely satisfied their fiduciary duties under section 77. 42 B.R. at 664-66. Pinney and Litton do not contend that the court's factual findings are clearly erroneous. On appeal, they also have apparently abandoned their argument that the trustees did not do all that was required under Section 77 with regard to notice to creditors
 
 
 [8]
 For example, in January, 1973, the President of Pinney decided, against the advice of counsel, not to take any further legal action against PCTC. His decision was apparently based upon business and financial reasons. Litton was aware of the railroads' meeting in April, 1971, and told C & O that it was not interested in doing business with PCTC, or having PCTC control Litton's business relations with the other railroads. By May, Litton concluded that C & O had capitulated to PCTC and the other railroads, rendering its pursuit of reasonable unloading charges useless. See Appendix at 312-17, 504, 521-22, and 546-62
 
 
 [9]
 Pinney and Litton do not claim any equitable basis for relief other than the alleged fraudulent concealment by the debtor
 
 
 [10]
 We also note that the inability to sue PCC as a named defendant in the Cleveland actions does not prevent Pinney and Litton from calling former PCTC officers or employees as witnesses